THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* AVERY BRINSON, Defendant-Appellant.

Second District   No. 78-544

Opinion filed January 21, 1980.

Mary Robinson and John Lanahan, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis P. Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant was convicted of armed robbery and sentenced to not less than 6 nor more than 18 years imprisonment. He raises in this appeal the single issue that he was denied the effective assistance of counsel, basing this contention on three grounds: (1) Defense counsel failed to file a motion to suppress the defendant's inculpatory statement to the police, even though defendant's counsel had been informed by the defendant that he had been subject to intimidation and mistreatment in order to extract the confession; (2) Defense counsel did not move to suppress a pretrial or in-court identification by the victim, even though she knew the identification was weak and suggestive, and (3) Defense counsel failed to develop and pursue the only trial strategy which was logical under the circumstances of the case, thus reducing the proceedings to the level of a sham and a mockery.

The facts are simple. The Collins-Karcher Hotel in Waukegan was robbed at gunpoint of about $700 around midnight on November 26, 1977. The night clerk, Charles Britz, testified the robber was a black man wearing a purple knitted cap and a white trench coat. The police report indicates Britz told them the robber was between 5 feet 10 inches and 6 feet tall. However, in his testimony at trial, Britz testified that the robber was between 5 feet 7 inches or 5 feet 8 inches tall, and did not recall ever having given the police a different estimate of the robber's height. The defendant was between 5 feet 7 inches and 5 feet 8 inches tall. The State, however, stipulated that Britz originally told the police who responded to his call after the robbery that the robber was between 5 feet 10 inches and 6 feet tall.

On December 21, 1977, Britz was shown a photo lineup of seven pictures. At that time he picked out a photo of the defendant as a possible suspect. On cross-examination, it was called to his attention that the Brinson photo was the only one of the seven he looked at which had a blue marking over the name of the person portrayed—apparently an attempt—not entirely successful—to obscure the name. Britz could not recall whether the blue marking was over the name of the person on the photo when he tentatively identified Brinson as the robber. The blue marking did not entirely obliterate the name as the "A" and the "Y" of the first name and the "B" of the last name were discernible. In any event, the marking made that photo stand out somewhat from the others. The blue marking on the photo may also have been prejudicial in the in-court identification of the defendant's photo made by Britz. A police officer testified that the blue marking which was on the photo at the in-court identification was also on there at the original photo line-up. It seems entirely likely that Britz may have made his in-court identification from the blue mark, rather than from his recollection of the robber's features. It was thus a highly suggestive method of identification but it was not objected to by defense counsel.

The name of the defendant might have significance in view of the fact that he had been a guest at the Collins-Karcher Hotel for several weeks not long before the robbery. A couple of months before the robbery in question the defendant had been arrested on a robbery charge, later reduced to theft. He was granted probation on that charge on November 25, 1977, after spending 54 days in jail and was released the day before the robbery occurred. During his stay at the Collins-Karcher, the defendant testified, he had had a couple of confrontations with the night clerk, Britz. Britz, in his testimony, was equivocal as to whether or not he recalled Brinson as a guest who had stayed at the hotel prior to November 26. He testified he had "seen him come in." Britz maintained he did not recall Brinson as an individual guest and did not realize that he had stayed as a guest at the hotel until he reviewed the hotel register sheets. The defendant, on the other hand, testified he saw Britz about every night while he was staying at the hotel and he had several encounters with him as the result of the defendant coming in late at night and on one occasion Britz had told him he was going to ask him to leave because he had not paid his rent.

At the trial, Britz was permitted to stand alongside the defendant in a questionable attempt at in-court identification but even then did not positively identify him as the robber, saying only "it looks like him" but that he was not making a positive identification.

The defendant testified in his own behalf. He said that he did not willingly talk with the officers but when asked to accompany them to a

room for questioning he refused to leave his cell, at which point one of the officers "reached in the cell and grabbed me." They then took him to an interviewing room. The defendant said that after he had been given *Miranda* warnings he was interrogated by two police officers regarding the Collins-Karcher Hotel robbery and he denied participation in it. According to the defendant's version, after he had refused to admit he had committed the robbery, he was threatened and after persisting in his denial he was struck in the face by one of the interrogating officers. He was told to hold his head up and when he put his head down again an officer grabbed him by the hair, struck him several times in the face and rammed his head against the wall. That officer, according to the defendant, then left the room and the other officer stated to the defendant that he had better make a statement because the second officer didn't know what the first officer would do when he returned and he, the second officer, would not be able to stop him. The defendant also testified the officer made reference to a friend of his, Anderson by name, who had been killed two months before. The officer said, "he's dead and you're next." (Actually, Anderson had died as the result of a stabbing in a street fight but the defendant testified he did not know that at the time of trial.) The defendant testified he was told that a person, who had been picked up on a murder charge, would also testify that he knew the defendant was the one who robbed the Collins-Karcher Hotel. The defendant said he finally signed the statement typed up by one of the officers, after he had been told by the officer that when the other officer came back, "you are going to get the same thing your friend got." On the stand the defendant said he had signed the statement without reading it, that it was the officer's statement and some of the details were obviously false. The defendant pointed to the statement that he had planned the robbery of the hotel while he was looking at the hotel from his cell window, which the defendant said was impossible because he could not see the hotel from his cell window. While it was established that the defendant was incarcerated in a cell from which the hotel was not visible, a rebuttal witness testified that the defendant had made telephone calls from a location in the jail which indicated he might have been moved to a different cell during his incarceration, from which the Collins-Karcher Hotel could be seen. The jail records did not establish with any certainty whether or not the defendant had occupied more than one cell.

The interrogating police officers testified, denying they struck or intimidated the defendant in any way. There was a conflict in the testimony as to the duration of time of interrogation by the police, before the defendant signed the inculpatory statement. Detective Hanson testified it was approximately an hour to an hour and 20 minutes before the defendant admitted his guilt. Detective Miscichowski, in his

testimony, said he thought the defendant confessed after 30 to 40 minutes of questioning. At the preliminary hearing this officer had testified the defendant was only questioned for 20 or 30 minutes before admitting the robbery.

There is also a discrepancy between the statement and the words recalled by Charles Britz as having been used by the robber at the time of the robbery. According to the police statement, the defendant admitted saying to Britz, "This is a stick-up and don't make it no murder beef." Charles Britz, on the other hand, recalled the words the defendant used as being simply, "This is a hold-up, don't make any noise." He said the defendant then showed him the revolver and said, "Give me all the money you've got." Britz did not recall the robber using the colorful language indicated in the police statement, although since it was made at the time of a direct threat on his life, it would seem memorable.

Thus, the two pillars of the State's case, the identification and the confession, seem to have been reasonably vulnerable to attack by a motion to suppress. The identification, never positive, was tainted by being made at a photo lineup where the defendant's photo was distinctively marked and at least part of his name discernible. The victim and identifying witness denied, but the State stipulated to the fact, that the victim had initially reported the robber as being 5 feet 10 inches to 6 feet tall, weighing about 170 pounds, whereas the defendant was only 5 feet 7 inches and far below 170 pounds. Even more dubious was the fact that Britz did not recognize Brinson as having been a guest in the hotel for a period of over a month, prior to the robbery, whereas the defendant testified that Britz and he had had several confrontations. Some doubt is thrown on an identification made from an earlier photograph by a person who had seen the same person as a guest in his hotel but apparently did not recognize such person as a guest when shown his photograph. This cannot but raise a question as to the witness' powers of observation and recognition. Moreover, the distinctive marking on the defendant's photo was suggestive enough to throw doubt on the genuineness of the identification, in addition to the fact that the obliteration of the defendant's name on the photo was not complete but left some letters discernible. Thus it appears there was both a discrepancy and suggestiveness in the identification.

Apart from the unlikelihood that the defendant would, on the day he was released from jail, go back and rob the hotel he had been living in, there is the remarkable fact that neither Britz, the clerk, nor Robert Skulavik, who testified he was standing at the desk talking to Britz when the robbery occurred, noted the fact that the defendant was a person who had been a former guest at the hotel. Skulavik was very uncertain in his

description of the robber but in such description as he gave he never referred to having seen the defendant before, although he had been living in the hotel during the time the defendant was residing there. The fact that neither Britz nor Skulavik recognized the robber as a person they had seen before throws some doubt on the defendant having been the robber. The defendant could not have known, of course, that Britz would not recognize him as a former guest, yet if the identification was correct, the defendant, a former guest of the hotel, who had several times had occasion to talk with the clerk, approached the hotel clerk while the clerk was talking to another guest and robbed him at gunpoint without even the pretence of a disguise to hide his identity.

■■ With all of these dubious factors present we cannot help but agree with defendant that the failure to move to suppress either the photo lineup or the suggestive in-court identification was not effective representation by defense counsel. Likewise, in view of the defendant's detailed story about the circumstances preceding his confession, indicating it was induced by coercion and intimidation, we think defense counsel would normally be expected to move for suppression of the confession on the ground it was not voluntary.

■■ Under Illinois law, when the voluntariness of a confession is challenged by the defendant, the trial court decides the issue as a preliminary question outside the presence of the jury. (*People v. Lego* (1965), 32 Ill. 2d 76; *People v. Miller* (1958), 13 Ill. 2d 84.) In *Jackson v. Denno* (1964), 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, the United States Supreme Court held that the defendant has a constitutional right to have the voluntariness of his confession determined in advance by the trial court, rather than having it passed on by the jury charged with determining the defendant's guilt or innocence as part of its general consideration of all the evidence. In *Jackson*, the court commented:

> "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession [citation], and even though there is ample evidence aside from the confession to support the conviction. [Citations.] Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." 378 U.S. 368, 376-77, 12 L. Ed. 2d 908, 915-16, 84 S. Ct. 1774, 1780-81.

While it is entirely possible that after the hearing the motion to suppress would have been denied, the defendant would at least have had

a motion on record and a denial thereof to assign as error. As the matter was allowed to progress, no motion having been made, the question was entirely foreclosed.

■■ Moreover, no instruction was requested by defense counsel and none was given as to the jury's consideration of the confession. We think the instruction designated Illinois Pattern Jury Instructions, Criminal, No. 3.07 (1968) should have been requested by defense counsel and given by the trial court, denoting a standard whereby the jury could judge the weight of the confession. The issue as to the confession's credibility would thus have been presented to the jury by court instruction, rather than merely by closing argument of counsel. There does not seem to have been any strategic advantage to the defendant derived from foregoing the instruction.

Nor can we conceive of any sound defense strategy which would have induced defense counsel to either forego either a motion to suppress the identification—which was obviously weak—or a motion to suppress the confession—which, if the defendant's story was believed by defense counsel, as indicated by placing him on the stand to tell it, was coerced and legally involuntary. The failure to make such motions under the circumstances prevailing here indicates a fatalistic acceptance of the defendant's guilt or a lack of faith in his credibility, either of which fatally impairs any effective representation and is tantamount to no representation at all.

We are aware, of course, of the distinction in the Illinois cases as between the degree of effectiveness required of private counsel and that of court-appointed counsel on the question of effective representation. See *People v. Morris* (1954), 3 Ill. 2d 437, 444, citing *People v. Pierce* (1944), 387 Ill. 608; to the effect that he who employs his own counsel is more or less stuck with the result. We think the representation by private counsel in this case was ineffective to a degree that brings it to the sham or farce level, through failure to adopt or present any logical or available theories of defense and without obtaining any advantage from foregoing such defenses.

Therefore, the judgment of the circuit court of Lake County is reversed and the cause remanded for a new trial.

Reversed and remanded.

SEIDENFELD and WOODWARD, JJ., concur.