THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GUILLERMO FERNANDEZ *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 84—2839, 84—2840 cons.

Opinion filed October 13, 1987.—Rehearing denied December 18, 1987.

James J. Doherty, Public Defender, of Chicago (Georgeen M. Carsen, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Terry Takash, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

After a jury trial, defendants Guillermo Fernandez and Angel Pena, both of whom are mentally retarded, were found guilty of one count of rape, two counts of deviate sexual assault, one count of unlawful restraint, and one count of aggravated battery, for which Fernandez was sentenced to a term of eight years' imprisonment and Pena received seven years. We reverse the decision of the trial court and remand the cause for a new trial for the reason that the defendants did not have effective assistance of counsel.

The record discloses that Margaret Mahoney (Margaret), 27, the alleged rape victim, originally met Fernandez at a sheltered workshop for mentally retarded adults. Margaret is also mentally retarded. She and Fernandez began dating, and, according to his testimony, during the course of their relationship they engaged in sexual intercourse 40 to 50 times, often at the Renaissance House for retarded adults where Margaret lived. Margaret's roommate Janet apparently observed them perform various sexual acts while she maintained lookout for supervisors. Later, at Janet's request, Fernandez asked Pena to be a sexual partner for Janet. The defendants thereafter frequently went to the Renaissance House and each couple would have sex while the other watched for supervisors. However, after several months of such activity, Fernandez ended his relationship with Margaret.

The testimony adduced at trial conflicted sharply concerning the subsequent course of events. Fernandez testified that Margaret was

desperate after their breakup and called his house repeatedly, telling him that she would prove her love by having sex with him and Pena together. Fernandez then talked with Pena and proposed to him that they both have sex with Margaret. After initial reservations, Pena agreed with the suggestion. On July 8, 1983, Fernandez and Pena went to the Renaissance House and asked Margaret if she wanted to go out for some ice cream, but she refused the invitation, telling them that she had to complete her chores. The defendants left when they saw a house supervisor approaching. That night, Pena stayed at Fernandez' house, and they talked about having sex with Margaret together. The next day Fernandez returned to the Renaissance House and picked up Margaret. According to his testimony, she left with him voluntarily. They boarded a bus and proceeded to his house.

When they arrived at Fernandez' residence, Pena was there waiting for them, and the group had a cold drink in the kitchen. Fernandez testified that Margaret voluntarily began to remove her blouse, and that prompted him to suggest that the threesome go upstairs to his bedroom. Pena testified that Margaret then willingly performed fellatio on Fernandez, and Fernandez agreed that Margaret readily engaged in oral sex. Fernandez claimed that Margaret then consented to sexual intercourse and that she did not object when he bit her as part of the sexual act. He said that Pena did not bite Margaret. Fernandez related that Margaret then requested that they "have sex like a dog" and that she asked that they tie a belt around her neck like a leash. Pena testified that Fernandez wanted to perform cunnilingus, but he complained that Margaret had too much pubic hair, so Fernandez shaved it off with an electric razor. Pena also maintained that Margaret asked Fernandez to put a wooden coat hanger against her vagina and move it like a vibrator.

After approximately three hours of these various sexual acts, the defendants allowed Margaret to leave. Fernandez testified that before she left, they quarreled about her soiled underwear and whether she could accompany them to a bachelor party that night. He claimed that Margaret threw her panties into a waste can and left, saying as she was leaving, "I'll fix you!" because of her anger at not being able to go to the party.

In contrast to the defendants' narration of these events, Margaret conceded that she agreed to have sex with Fernandez, but she denied agreeing to have sex with Pena. She stated that Fernandez told her that he and Pena would be waiting for her and that she would be in for a surprise. She claimed, however, that when Fernandez came to her house, she did not leave with him willingly, but instead he pushed

her down the street and forced her to get on a bus with him, threatening to kill her. She admitted, however, that she did not really believe he would follow through on the threat. At any rate, she admitted that she did not seek help or attempt to escape. On the way to Fernandez' house, she even saw a police car, but she asserted that she did not call out for help because she was scared. Upon arriving at Fernandez' house, she told both defendants that she wanted to go home, and she began to cry. She testified that Fernandez then ordered her upstairs and demanded that she take off her clothes.

Margaret claimed that over her objections she was then forced to engage in oral sex with Fernandez. She asserted that Fernandez then laid on top of her, bit her breast, and requested that Pena join him in these acts. Pena then proceeded to get on top of her, and they then both bit on her breasts, stomach, and sides. She testified that they also forced her to engage in anal intercourse and that she did not consent to having a belt put around her neck. She stated that the belt was tied so tightly around her neck that she vomited. In addition, she stated that Fernandez put "something sharp" inside her, and that she was crying and screaming during the entire incident. After several hours, Margaret claimed she was permitted to leave, but forgot her underwear when she ran from the house, bleeding. She also noted that Fernandez threatened to have the Latin Kings get her if she told anyone that he had raped her.

Lawrence Golsten, Fernandez' neighbor, testified that at 3 p.m. on July 9 he was standing in front of his home when he heard someone scream "Help me!" Margaret then ran to him and asked for assistance, claiming that she had been raped. Golsten observed that her face was "red and puffy." An ambulance was summoned, and she was taken to Illinois Masonic Hospital, where she was examined by Dr. Dennis Uehara, who testified that he observed bruises and bite marks on her neck, arms, breasts and stomach. He also noted that she was bleeding from her vagina, and a subsequent pelvic examination led to the discovery of three lacerations five inches inside her vaginal tract, which required sutures to heal.

Chicago police officer Carey Orr testified that at approximately 6 p.m. on the day of the alleged rape he went to Fernandez' home and informed him that he was under arrest, to which Fernandez replied, "Is this about Margaret?" Orr stated that he read Fernandez his *Miranda* rights, and he recalled that Fernandez indicated that he understood the implications of making any statements. Orr then asked the suspect, "What did you use on Margaret?" Fernandez then brought Orr to his bedroom and pointed to an object which Orr de-

scribed as the top half of a wooden coat hanger. Orr questioned Fernandez as to where he put Margaret's underpants, and Fernandez pointed to a trash can, where the underwear was found in a paper bag. Fernandez also gave Orr the electric razor and belt which were used during the sexual activities.

The record is not clear when Pena was arrested. However, Assistant State's Attorney Susan Sussman testified that at about 8:15 p.m. on July 9 she questioned Pena, and he told her that two days earlier he and Fernandez had planned to have sex with Margaret. Pena related at this time that he and Fernandez shoved a wooden stick and a razor in Margaret's vagina, and that she was screaming and crying. After interviewing Pena, Sussman then interrogated Fernandez, who also admitted that they had planned the incident two days earlier. He recalled that Margaret had cried and screamed during the ordeal, but that she often cried during sex. He further told Sussman that he shaved Margaret's pubic hair and pushed the razor and a wooden stick into her vagina, and that Pena wanted to shove a broken bottle into her vagina, but that he stopped him.

After lengthy deliberations, the jury requested that Assistant State's Attorney Sussman's testimony regarding the statements made by the defendants be read back to them, and the court granted the request. A guilty verdict was subsequently rendered.

The record discloses that three days into trial, prior to the testimony of Orr and Sussman, but after Golsten and Margaret had testified, defense counsel filed a motion to suppress any alleged statements or confessions of the defendants. Anticipating Orr's and Sussman's testimony, the defense attorney argued that the motion to suppress was based on the contention that, because of their mental handicap, the defendants did not have the capacity to willingly, knowingly, and intelligently waive any *Miranda* warnings which may have been given. The defense also requested a hearing outside the presence of the jury to determine the voluntariness of any statements which were made. The trial court, however, refused to hold a hearing on the ground that the motion was untimely, relying on section 114—11 of the Code of Criminal Procedure of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 114—11), entitled "Motion to Suppress a Confession," which states as follows:

> "(a) Prior to the trial of any criminal case a defendant may move to suppress as evidence any confession given by him on the ground that it is not voluntary.
>
> (b) The motion shall be in writing and state facts showing wherein the confession is involuntary.

(c) If the allegations of the motion state facts which, if true, show that the confession was not voluntarily made the court shall conduct a hearing into the merits of the motion.

\* \* \*

(g) The motion shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion."

This statute clearly sets forth that the appropriate time for filing motions to suppress is prior to trial, unless the circumstances of the case indicate that the section 114—11(g) exception should apply.

■■ The defendants argue on appeal that the section 114—11(g) exception applied, and therefore, the trial court should have held a hearing to determine the voluntariness of their confessions. We disagree. Section 114—11(g) is inapplicable herein in view of the fact that defense counsel received copies of the statements transcribed nonverbatim in police reports eight full months prior to trial. Accordingly, the defense obviously had the time and the opportunity to raise their motion to suppress, and there was no reason for them to have been unaware of the grounds which could have been advanced in support of the motion. Under similar circumstances, in *People v. Placek* (1975), 25 Ill. App. 3d 945, 951-52, 323 N.E.2d 410, this court held that the trial judge properly denied the defendant's motion for suppression of a confession where defense counsel received the defendant's statements from the State five months prior to trial, but failed to raise the motion until after the trial had commenced. The court reasoned that defense counsel could not assert at trial that he had no knowledge that grounds for the motion existed or that defendant was denied an opportunity to present the motion. (See also *People v. Torres* (1981), 93 Ill. App. 3d 718, 720-21, 417 N.E.2d 728.) The defense attorney in the instant case also should have been aware of the grounds for suppression well in advance of trial, and therefore the fact that the court denied the motion to suppress as untimely was not error in this instance.

The defendants make an ancillary argument that they were denied effective assistance of counsel because their attorney failed to file a timely pretrial motion to suppress their confessions. The record indicates that the reason no pretrial suppression motion was filed was due to defense counsel's misguided impression that the State could not introduce into evidence statements which were transcribed "nonverbatim," and therefore she did not perceive the need to file a motion to suppress. Apparently, only after the State added Sussman's name to the witness list shortly before trial was defense counsel al-

erted to the fact that the prosecution intended to use the statements at trial. Even then, she waited until three days into trial before presenting her motion.

Defendants propose that defense counsel's belief that the prosecution could not introduce evidence of oral statements illustrates a lack of basic competence. The United States Supreme Court has adopted a two-prong standard to prove a claim of ineffective assistance: the defendant must show that his counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed *** by the Sixth Amendment," and that he was prejudiced as a result, *i.e.*, "that counsel's errors were so serious as to deprive [him] of a fair trial." (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) Emphasizing that the defendant must prove prejudice, the court indicated a defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; see also *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246.) Our courts have held that the failure of counsel to make a motion to suppress is not *per se* incompetence of counsel, but depends on the circumstances of each case. (*People v. Calderon* (1981), 101 Ill. App. 3d 469, 476, 428 N.E.2d 521; *People v. Mitchell* (1979), 78 Ill. App. 3d 851, 853, 397 N.E.2d 569.) Ordinarily, neither an error in professional judgment nor trial strategy can establish incompetency of counsel (*People v. Taylor* (1982), 110 Ill. App. 3d 112, 116, 441 N.E.2d 1231), and tactical decisions, including in some instances filing pretrial motions, are generally beyond appellate review of attorney's competence. (*People v. Brittain* (1976), 35 Ill. App. 3d 1047, 1054, 342 N.E.2d 814.) It is also axiomatic that a "defendant is not entitled to a perfect or successful defense, only a competent one." *People v. Elder* (1979), 73 Ill. App. 3d 192, 203, 391 N.E.2d 403.

An examination of the case law illustrates that our courts have been quite reluctant to find that the failure to file a motion to suppress evidence constituted ineffective assistance of counsel. Many of the opinions denying that counsel was ineffective rely on the premise that the decision whether to file a suppression motion was essentially a tactical one, and the trial attorney's professional judgment should not be questioned on review. (*People v. Taylor* (1982), 110 Ill. App. 3d 112, 116, 441 N.E.2d 1231; *People v. Goins* (1981), 103 Ill. App. 3d 596, 600, 431 N.E.2d 1069; *People v. Gray* (1981), 95 Ill. App. 3d 879, 884-85, 420 N.E.2d 856 ("[d]efense counsel has no duty to advance

specious claims of constitutional deprivation"); *People v. Ruple* (1980), 82 Ill. App. 3d 781, 786-87, 403 N.E.2d 129; *People v. Brown* (1977), 56 Ill. App. 3d 348, 352, 371 N.E.2d 982; *People v. Brittain* (1976), 35 Ill. App. 3d 1047, 1054, 342 N.E.2d 814.) Others have held that the defendant failed to show a reasonable probability that the outcome would have been different had the suppression motion been granted. *People v. Winchel* (1987), 159 Ill. App. 3d 892, 913; *People v. Byrd* (1986), 139 Ill. App. 3d 859, 864, 487 N.E.2d 1275; *People v. Purnell* (1984), 126 Ill. App. 3d 608, 624, 467 N.E.2d 1160; *People v. Cheung* (1980), 83 Ill. App. 3d 1048, 1054, 404 N.E.2d 558; *People v. Griffith* (1979), 68 Ill. App. 3d 188, 191-92, 385 N.E.2d 843.

Nevertheless, we have found that under certain circumstances the failure to file a motion to suppress constituted ineffective assistance of counsel. (*People v. Neeley* (1980), 90 Ill. App. 3d 76, 79-81, 412 N.E.2d 1010; *People v. Brinson* (1980), 80 Ill. App. 3d 388, 393-94, 399 N.E.2d 1010; *People v. Odom* (1966), 71 Ill. App. 2d 480, 486-87, 218 N.E.2d 116.) In *Neeley*, this court found ineffective assistance because the attorney failed to file a motion despite the defendant's claim that his confession was the product of physical abuse and coercion. Similarly, in *Brinson* we determined that defense counsel's representation was ineffective due to two major failings: first, he failed to make a motion to suppress suggestive identification evidence, and second, despite clear evidence corroborating defendant's testimony that he was beaten and coerced into confessing, he failed to move for the suppression of the statement. Moreover, in *Odom*, this court made the following cogent remarks:

> "The public defender exercised none of the preliminary procedures available to him prior to trial. *** But in the instant case defense counsel made no effort to exclude the confession despite the fact that he must have known, if he conferred at all with his client ***, that [a] serious question existed as to the voluntariness of the confession. In so doing he gave his client no protection whatsoever against being convicted on the basis of a coerced confession." 71 Ill. App. 2d 480, 484, 218 N.E.2d 116.

■ We believe that the conditions confronted in these three cases are apposite to the circumstances presented in the case *sub judice*. Though it is true, as the State points out, that there was no evidence of coercion of the defendants in the instant case, the ineffectiveness of counsel herein is nevertheless accentuated by the fact that the defendants were mentally retarded. The defendants' handicap, like the evidence of coercion in the three above-cited cases, should have

alerted the defense attorney to the possibility that the defendants did not understand their *Miranda* rights, and hence, that their statements were conceivably involuntary. In addition, we cannot conceive of any sound defense strategy which would have induced defense counsel to file the motion to suppress the confessions three days into trial. Indeed, the attorney admitted in her tardy motion that it was her misunderstanding of the law, rather than a tactical consideration, which resulted in the failure to press the issue of the voluntariness of the confessions. Accordingly, we hold that the defense attorney's failure to file a motion to suppress in the instant case was an error clearly outside the wide range of professionally competent assistance.

Nor can we justifiably say that even if a pretrial suppression motion had been made, the outcome would not have been any different. We reiterate that the defendants were retarded, and under such circumstances, we believe that their alleged confessions were "reasonably vulnerable to attack by a motion to suppress." (*People v. Brinson* (1980), 80 Ill. App. 3d 388, 392, 399 N.E.2d 1010.) Moreover, if the motion to suppress had been granted, it is quite probable that the jury would not have found the defendants guilty beyond a reasonable doubt based on the other evidence in the case. As a matter of fact, the importance of the defendants' alleged confessions is underscored by the fact that the jury requested that the court read Sussman's testimony back to them before they rendered a decision, indicating to us that her recollections of the defendants' statements weighed heavily in the jury's deliberations.

Accordingly, we reverse the decision of the trial court and remand the cause for a new trial.

Reversed and remanded.

HARTMAN and BILANDIC, JJ., concur.