THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT PURIFOY, Defendant-Appellant.

Second District No. 2—87—0195

Opinion filed August 4, 1988.

Robinson & Skelnik, of Elgin (Josette Skelnik, of counsel), for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of Elgin, and Dale M. Wood, of State's Attorneys Appellate Prosecutor's Office, of Springfield, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

After a jury trial, defendant, Robert Purifoy, was found guilty of murder and was sentenced to a term of 30 years' imprisonment in the Department of Corrections. On direct appeal, where the only issue raised was whether defendant's sentence was excessive, this court affirmed the judgment in a Rule 23 order (*People v. Purifoy* (1985), 135 Ill. App. 3d 1164 (unpublished Rule 23 order)). The present appeal is from the denial of defendant's petition for post-conviction relief.

Defendant now argues that he was denied effective assistance of counsel because his trial attorney did not move to suppress defendant's statements. He also contends that he was denied effective assistance of counsel on direct appeal because appellate counsel did not raise as error the ineffective assistance of trial counsel or the trial court's refusal to give certain instructions tendered by defendant. For the reasons set forth below, we affirm.

Defendant was charged in a two-count indictment filed on May 2, 1984, with the murder of Oscar Perez. The first count alleged that defendant, with the intent to kill or do great bodily harm to Perez, shot and killed him. The second count alleged that defendant killed Perez while attempting or committing the forcible felony of burglary.

The shooting with which defendant was charged occurred at the home of Sergio Guzman, 1317 Harold Avenue, in Loves Park, Illinois,

on the evening of April 14, 1984, a Saturday. The victim of the shooting, Oscar Perez, was Guzman's brother. Perez did not live at the house but was there on the evening of April 14 with his girlfriend, Yolaida Morell. The State's evidence demonstrated that the victim had died from a single gunshot wound which penetrated his heart muscle and which entered through the front door of the house. Another shot also went through the front door of the house, and that projectile was found lodged in the wood trim of the south wall of the house, several feet from the base of the floor.

Upon their arrival at the scene, the police recovered a .38 caliber gun from near the victim's left side and a spent cartridge from next to his right leg. The spent cartridge had been discharged from a .38 caliber weapon, while the projectiles removed from Perez' body and from the wood trim of the house were .22 caliber. With regard to the two bullet holes discovered in the front door of the house, the police determined that one bullet had passed through the solid part of the door, while the other had passed through the door curtain, blackening the area of the curtain around the hole. In the opinion of firearms and tool mark examiner Peter Striupaitis, both of these gunshots were probably close to contact shots with respect to the door.

Sergio Guzman, the owner of the house on Harold Avenue, testified that he had two stereos inside his home as of April 14. One, an old one, was kept by the front door and was blocking it, because he never used his front entrance. Rather, he used only the side entrance and kept the front door locked. He also had a newer stereo in his home which his brother Oscar had bought. In addition, he kept some coins in his home in a cement container.

On occasions prior to the shooting of his brother, Guzman had experienced problems with people trying to break into his home. On one occasion, he observed someone face-to-face who was tampering with his door, whom he described to the police as a teenager, approximately 5 feet 3 inches in height and stocky. On the Friday evening before his brother was shot, someone had tried to open a back window at the house. The next evening, Guzman left to play pool, leaving his brother and his brother's girlfriend behind in the house. Before leaving, he discussed the attempted break-in of the prior evening with his brother and told him that if someone tried to break in that night, he should use the gun in the house to defend himself. Although he testified that three Purifoys had played cards at his house about one week prior to the shootings, the witness stated he did not know the defendant and had never seen him before.

Yolaida Morell, Oscar Perez' girlfriend, testified that after Guz-

man left the house, she and Perez watched television until about 9 p.m. They then turned off the set and went into the bedroom where they sat and talked; no lights were on in the house at the time.

Not long after going into the bedroom, they heard a knock at the side door. Perez, looking out the window, told Morell he saw a car belonging to one of his relatives, but he instructed her to not answer the door because he wanted whomever was trying to break in to think no one was home. Shortly thereafter, they heard another knock on the side door, and Perez looked out but did not see any cars. Whoever was at the door then began knocking very hard, and Perez told the witness that it must be the person who had been trying to break into the house before. At Morell's urging, Perez picked up the gun which his brother kept on a table in the bedroom.

Shortly thereafter, Morell heard a sound at the front door like someone cutting glass and also heard sounds as though someone were going through papers, although she did not see anyone in the house. Someone shone a light in the living room, and she heard a voice say, "Come out, we want your money." Perez moved out of the bedroom and toward the kitchen and then squatted down next to the television set with the gun in both hands, pointing it in the direction of the front room. Right after that, the witness heard two shots. She stayed in the bedroom for a few more minutes and then went out and discovered Perez lying in the doorway between the kitchen and the front room. Morell could not identify anyone as being at the house that evening.

Terry Purifoy, a cousin of the defendant, testified at trial as a witness for the State. On the evening of April 14, 1984, he and his girlfriend, Sue Mackey, drove over to the home of Robert Purifoy's parents, where they sat in Terry's car to await the return of Terry's mother from a nearby church. While they were sitting in the car, Robert came up and asked Terry if he would go with him to check out a stereo and television. Terry agreed and walked with Robert over to a house on Harold Avenue, about one block away from where Robert's parents lived.

When they arrived at the house, Terry and Robert went up to the side door and Robert knocked five or six times but got no response. Robert then walked around to the front door, and Terry followed within 30 seconds thereafter. When he went to the front door, Terry observed Robert squatting down and looking through the door, which was open about three inches. When he saw that the door was open he said to Robert, "Cos, let's go." Robert responded, "Someone is in there." Terry again attempted to persuade the defendant to leave,

and he then left on his own and returned to his aunt's house.

Fifteen or twenty seconds thereafter, Robert also returned. Robert told Terry that he wanted to go back to the house, and he, Terry, and Robert's older brother, Roger, headed back in that direction, with Robert taking along a flashlight. When they returned, Roger stood near the street, and Terry stood behind a tree while Robert went back to the front steps. Within a minute thereafter, Terry heard two shots, and he and Roger took off running. As they were running, Terry heard one more shot. All the shots were within seconds of each other, with the third shot being more solid and heavier sounding than the first two.

Terry stated that neither he, Roger, nor Robert ever went into the house on Harold Avenue that night. In addition, he never saw Robert attempt to enter the house, nor did he ever see Robert with a gun. During the minute and a half or so that Robert was on the porch on their second visit to the house, Terry only observed him trying to look in to see who was inside. The witness denied that he had gone over to the house with defendant in order to burglarize it. Rather, he said, "I went over with him because he wanted me to check out a stereo. When I say check out, I mean look at the stereo."

Terry acknowledged that he had given a statement to the police about one week subsequent to the shooting in which he said that he had seen Robert with a gun that night, but testified that he made that statement "through force." He explained that he was told he had a choice either to admit he saw Robert with a gun or to be locked up under no bond and charged with murder. The detectives who questioned him about the shooting informed him that, if he told the truth, and if he was not the person who pulled the trigger, he would not be charged with any offense. Thereafter, he gave the detectives the statement in which he told them that Robert had a gun. Winnebago County Detectives Roland Kincannon and Robert Ferger confirmed that they had told Terry that he would not be charged if he told the truth and was not the one who had fired the gun.

Sue Mackey, Terry Purifoy's girlfriend, also testified for the State. On the evening of April 14, Terry and Robert left Robert's parent's house and returned about 10 minutes later. They left a second time and were gone for about 15 to 20 minutes. During the second time they were gone, Mackey heard two gunshots. Five to ten minutes later, Robert and Terry returned to the Purifoy house along with Robert's brother, Roger. The witness stated that she did not recall any conversation occurring at that time regarding the gunshots, but upon having her memory refreshed with a police report, stated that

she recalled asking Terry where the shots came from. Terry responded that someone had been in the house and that Robert had seen a gun and had fired two shots into the house. Robert commented that if he had shot somebody, he hoped he didn't kill them.

Sometime later, the witness observed a coroner's car in the area and commented that someone must be dead because the coroner was there. Robert then said, "Oh, my God, I have killed a man." After again having her memory refreshed by a police report, Mackey also agreed she had told the police that later that evening, while she, Terry, and Robert were at Roger Purifoy's house, Robert told them that he had seen a man's arm come down with a gun in the kitchen and that he just started shooting, and it seemed the trigger pulled itself. He was crying while he said this and said that he could not believe that he had killed a man.

Roger Purifoy, defendant's brother, testified for the defense. At approximately 9:30 p.m. on April 14, he went over to his mother's house, where he saw Sue Mackey. He asked her where his brother and cousin were and headed off in the direction she indicated. As he began walking, he heard three shots and returned to his mother's house. He described the first shot as loud and the other two as "medium, smaller." A few minutes after he heard the shots, Terry and Robert showed up at his parent's house. Roger never saw Terry or Robert in possession of a gun that evening, nor did he ever hear Robert say that he killed a man. He acknowledged that he had told the police that he saw Terry Purifoy standing by a tree in front of the house on Harold Avenue when he heard the shots.

Winnebago County Detectives Roland Kincannon, Robert Ferger and Michael Easton testified for the State as to various statements made by defendant. On Monday, April 23, 1984, and again on Tuesday, April 24, Detectives Kincannon and Ferger spoke to Robert Purifoy at the Public Safety building of the sheriff's office regarding the shooting. On both occasions, Purifoy told the detectives that on the night in question he was at his parent's house with his brother Roger and cousin Terry. After he had been at the house for about an hour, he noticed police cars and an ambulance in the area. He did not provide any other information relating to the time of the shooting on either occasion. Defendant was not in custody on April 23 or 24 and was allowed to return home following each questioning session.

Defendant was arrested on April 25, 1984, following the taking of Terry Purifoy's statement. At approximately 9 a.m. on April 26, Detective Easton was in the jail section of the Public Safety building and noticed Robert sitting on a bench. Although Easton was not involved

in the investigation of the Perez shooting, he decided to talk to defendant because he had known Robert for five or six years and felt that Robert trusted him.

When Easton saw Robert, defendant appeared to be sick; he was coughing loudly and spitting up. Easton sat down next to Robert and asked him if he wanted to talk about the shooting. Defendant agreed, and the two of them went into an interview room.

After advising defendant of his rights, Easton began to question him about the shooting incident on Harold Avenue. Defendant told him that he was at the house when the shooting occurred but that it was his cousin, Terry, who had shot the victim. He stated that Terry had shown him a gun which Terry had taken in a burglary; Robert believed the gun looked larger than a .22 caliber. At the time Terry fired the gun, Robert was standing along the side of the house.

During the time Easton was interrogating Robert, defendant continued to cough and spit up, almost to the point of dry heaving. Easton found it very difficult to talk to defendant because defendant would cough and spit up every three or four minutes. He stated that he suggested to defendant that he lie down and call him later but that defendant wanted to continue to talk. Ultimately, at approximately 9:45 a.m., Easton told defendant to lie down and call him later.

When asked if he determined why defendant was sick, Easton stated that at one point Purifoy indicated he thought he had sickle cell anemia, and at another point, he said he was hurting from a beating he had suffered a few days previously in which he had been battered pretty badly. Easton noted there had been a police report filed with regard to this beating and that he, Easton, was aware of it.

Later on April 26, Easton received a phone call from the detective bureau telling him that defendant wanted to see him again. He and Detective Ferger went to the Public Safety building at about 1 p.m. to question defendant. On that occasion, according to the witness, defendant told the detectives that on the night in question his cousin Terry came over to his parent's house. Terry told Robert that he needed some money, and Robert told him that some Mexicans who lived on Harold Avenue had a stereo and some other things to get. He also told Terry that the Mexicans were usually at home. Terry told Robert that it did not matter if they were home because he, Terry, had a gun. If they shot at him, he would shoot back. Terry, Robert and Roger then went over to the house on Harold Avenue in order to break in.

When the three of them got to the house, Robert stood in the front yard behind a tree, and Terry walked up to the front porch.

Terry broke out a panel of glass in the front door but was unable to open the door. He walked off the porch to where Robert was standing and asked Robert to try to open the door. As Robert was trying to do so, a Mexican in the house shot at him, and Terry, who was standing behind a tree, shot back. The three Purifoys then ran off.

Detective Ferger testified that Robert had been told during the interrogation that the police needed to have the shooting of Perez investigated and solved as quickly as possible, so that there would not be further problems out in the neighborhood. However, he denied telling Robert that if the matter were not resolved and the Mexican community retaliated, Robert's parents' home would probably be destroyed. Ferger also testified that, because defendant's statement as to who fired the gun was not consistent with the State's physical evidence, in that the gun had been fired while close to the door, it appeared to him that the statement was false.

At the close of the testimony, an instructions conference was held. Defense counsel tendered instructions on self-defense and voluntary manslaughter, arguing that there was evidence in the record to support a finding that defendant had no felonious intent when he went to the house on Harold Avenue and that, if the jury made such a finding, it could also find that defendant was acting, or believed he was acting, in self-defense when the two shots were fired into the house. The trial court refused the instructions, finding that the evidence "[c]ould not in any way be interpreted" to justify them. Upon inquiry by defense counsel as to whether he would be allowed to comment on voluntary manslaughter and self-defense in his closing argument, the court stated that it would be inappropriate to discuss the elements of that charge or defense in light of the court's ruling on the jury instructions.

Following closing arguments, the jury returned a verdict finding Robert Purifoy guilty of murder. On October 5, 1984, the court sentenced defendant to a term of 30 years' imprisonment. On the direct appeal of his conviction, defendant was represented by the office of the State Appellate Defender. That office raised only the issue of whether defendant's sentence was excessive. Defendant's sentence was affirmed.

Defendant first argues he was denied effective assistance of counsel due to trial counsel's failure to file a motion to suppress, on involuntariness grounds, the statements defendant gave to Detectives Easton and Ferger. In support thereof, defendant notes that, according to Easton's testimony, defendant was physically ill the morning of the statements, that Easton was not assigned to the case when he ques-

tioned defendant, that there is no evidence that defendant received medical attention for his illness, and that no evidence was presented of a written waiver of defendant's rights at the time of the statements. Defendant maintains that, given these indications of the involuntary nature of his statements, trial counsel should have moved to suppress them, especially since his statement that he and Terry intended to burglarize the Guzman house was the only evidence which directly established felonious intent and was tantamount to a confession to felony murder.

■ The test for effective assistance of counsel is two-part. To prevail on this issue, a defendant must show, first, that his counsel's performance fell below an objective standard of reasonableness and, second, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 525.) In this case, defendant has not shown a reasonable probability that the result of the trial would have been different even if counsel had made a motion to suppress defendant's statements. The only evidence as to the statements came from the testimony of Easton and Ferger, and, from a review of their testimony, it appears that defendant's statements were voluntary. From the record in this case, it is clear that a motion to suppress would not have succeeded, and thus defendant was not deprived of effective assistance of trial counsel. *People v. Mitchell* (1984), 105 Ill. 2d 1, 13; *People v. Johnson* (1986), 143 Ill. App. 3d 34, 43.

■ ■ Whether a statement is voluntary depends upon the totality of the circumstances. "The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome" at the time the statement was made. (*People v. Clark* (1986), 114 Ill. 2d 450, 457.) While the burden of proof at a suppression hearing is on the prosecution, the voluntariness of a statement need only be established by a preponderance of the evidence. (*Clark*, 114 Ill. 2d at 457.) Here, the totality of circumstances indicates that defendant's statements were voluntarily given.

Contrary to defendant's assertions, the presence of the symptoms testified to by Detective Easton is not sufficient to raise the inference that defendant's statements were not the product of free will or rational intellect. Although defendant was coughing and spitting up during the morning interview, defendant wanted to go on talking. Furthermore, there is no evidence, nor does defendant now contend, that

Easton or any other officers caused the illness or that they exploited his condition. Under similar circumstances, a defendant's statement has been held voluntary. In *Clark*, the defendant was coughing severely and repeatedly during questioning, and sometimes spit up. When asked about his condition, defendant replied that he had lung cancer and black lung disease. Soon afterwards it was learned that defendant was suffering from a crushed trachea. Nevertheless, the trial court's finding that defendant's confession was voluntary was upheld. (*Clark*, 114 Ill. 2d at 460.) Here, too, defendant's condition did not render his statements involuntary.

Although a defendant's physical condition at the time of questioning is an element to be considered in determining if a statement is voluntary (*People v. Rhodes* (1983), 119 Ill. App. 3d 1002, 1010, citing *Mincey v. Arizona* (1978), 437 U.S. 385, 396-402, 57 L. Ed. 2d 290, 302-06, 98 S. Ct. 2408, 2415-18), it is only one factor. The mere existence of pain is not sufficient to render a statement involuntary where there is no evidence that the pain suffered was of such nature and extent as to overcome the ability to understand *Miranda* warnings or the implications of the statement. (*Rhodes*, 119 Ill. App. 3d at 1011; *People v. Byrd* (1980), 90 Ill. App. 3d 429, 434.) Here, defendant's pain was not so severe as to cause him to terminate the questioning or request medical treatment; instead, defendant insisted on going on until Easton ended the interview. Even then, defendant apparently felt well enough a few hours later to seek Easton out again. Moreover, both Easton and Ferger testified that defendant displayed no symptoms of illness during the second interview. It was during the second interview that defendant admitted his intent to burglarize the Guzman house. In sum, there is no evidence that defendant's physical condition was so bad as to render his statements involuntary.

Nor does it appear that defendant's statements were involuntary due to the other factors on which he relies. Although defendant argues that there is no evidence that he received medical attention for his condition, there is also no evidence that he requested any or that treatment was improperly withheld. In any event, his malady had apparently abated by the time of the second interview when he disclosed his felonious intent. As for the circumstance that Easton was not officially assigned to the case when he approached defendant, defendant fails to demonstrate how this affected the voluntariness of his statements. Easton himself explained that he decided to talk to defendant because he had known defendant for some time and felt that defendant would trust him.

Although defendant also notes that no written waiver of rights

was produced, Easton testified that he read defendant his *Miranda* rights before each interview from a card which he carried. Defendant indicated that he understood each right. Easton's testimony regarding the afternoon interview was corroborated by Ferger. The testimony by the prosecution witnesses that defendant was advised of his rights on numerous occasions and was not coerced created a *prima facie* showing of voluntariness and shifted the burden to defendant to produce evidence that his statements were involuntary. (*People v. Adams* (1980), 91 Ill. App. 3d 1059, 1064, *cert. denied* (1981), 454 U.S. 849, 70 L. Ed. 2d 137, 102 S. Ct. 169.) Defendant here has not produced any evidence that he did not receive the required warnings, and defendant's counsel at the post-conviction hearing indicated that no such evidence was available. Since defendant has not adequately shown that his statements were involuntary, a motion to suppress would have been denied, and trial counsel was not ineffective for failing to file such a motion.

Defendant's reliance on *People v. Brinson* (1980), 80 Ill. App. 3d 388, is thus unavailing. Although this court held that failure to file a motion to suppress there constituted ineffective assistance of counsel, there was evidence there suggesting that suggestive identification procedures were employed, and there was also testimony that defendant's confession was induced by coercion and intimidation. (*Brinson*, 80 Ill. App. 3d at 393.) Here, in contrast, the factors relied on by defendant would not have supported the suppression of his statement.

Defendant next argues that he was denied effective assistance of counsel on his direct appeal where the only issue raised was whether his sentence was excessive. He contends that appellate counsel was ineffective in failing to assign as errors trial counsel's ineffectiveness and the trial court's refusal to give self-defense and voluntary manslaughter instructions. The State responds by arguing that defendant's post-conviction petition was legally insufficient to raise these issues because defendant did not allege that he disagreed with appellate counsel's strategy.

Although defendant did not allege in his petition for post-conviction relief that he wished appellate counsel to raise the above issues, such allegations were not necessary. The State does cite to cases which hold that in post-conviction proceedings issues which could have been raised on direct appeal are waived if there is no indication that defendant disagreed with the presentation made by appointed appellate counsel. (*People v. Agnello* (1966), 35 Ill. 2d 611, 613; *People v. Hamby* (1965), 32 Ill. 2d 291, 295 (no waiver because defendant's conflict with appellate counsel was apparent).) Those cases, however, are

not applicable to the case at bar. While the issues of trial counsel's effectiveness and the refusal of certain instructions could have been raised on direct appeal, defendant does not now raise those issues directly but claims appellate counsel was ineffective for failing to raise those issues. Our supreme court has held "that the doctrine of waiver ought not to bar issues from consideration where the alleged waiver stems from incompetency of appointed counsel on appeal." (*People v. Barnard* (1984), 104 Ill. 2d 218, 229-30, citing *People v. Frank* (1971), 48 Ill. 2d 500, 503.) We thus consider the merits of defendant's arguments.

 While a defendant is entitled to effective assistance of counsel on direct appeal as well as at trial, there is no obligation of appointed counsel to brief every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising those issues which, in his or her judgment, are without merit, unless the appraisal of the merits is patently wrong. (*Barnard*, 104 Ill. 2d at 230, *Frank*, 48 Ill. 2d at 505.) The two-part *Strickland* analysis is appropriate to test appellate counsel's performance as well as trial counsel's, so defendant must show that he was prejudiced by the defense. (*Barnard*, 104 Ill. 2d at 237.) Here, appellate counsel was not ineffective for failing to raise the issue of trial counsel's competence since, under the analysis above, trial counsel was not ineffective. Appellate counsel's appraisal of the merits of that issue was thus not patently wrong, and defendant was not prejudiced by failure to raise that claim.

 Defendant's second argument along these lines is that appellate counsel was ineffective for failing to assign as error the trial court's refusal of tendered instructions on self-defense and voluntary manslaughter. (Illinois Pattern Jury Instructions, Criminal, Nos. 7.05, 7.07, 7.08, 24—25.06 (2d ed. 1981).) Defendant correctly notes that in murder cases, if there is evidence in the record, which if believed by a jury would reduce the crime to manslaughter, a manslaughter instruction tendered by defendant must be given. (*People v. Leonard* (1980), 83 Ill. 2d 411, 420-21.) Even very slight evidence on a given theory will justify an instruction. (*People v. Rodriguez* (1981), 96 Ill. App. 3d 431, 435.) Such instructions should not be given, however, if the evidence clearly demonstrates that the crime was murder and there is no evidence upon which a jury might find the defendant guilty of manslaughter. *People v. Lockett* (1980), 82 Ill. 2d 546, 551.

Defendant argues that there is evidence in this case to show that he did not intend to burglarize the Guzman house. He points to Terry Purifoy's testimony where Terry denied that they returned to the house to burglarize it, but only to "check out" the stereo and where

Terry testified that he never saw defendant try to enter the house. Defendant further contends that his loud knocking on the side door was inconsistent with an intent to commit burglary. Lastly, he maintains that Sue Mackey's testimony that defendant expressed sorrow for killing a man he had seen holding a gun would have supported a finding of self-defense or manslaughter.

■■ After reviewing the evidence on which defendant relies, we do not believe that the trial court erred in refusing the tendered instructions. In refusing the instructions, the trial court found that the only possible conclusion the jury could come to was that defendant had gone to the Guzman house with the intent to burglarize it. That finding is supported by the evidence which clearly shows that defendant was trying to gain unauthorized entrance to the house. Moreover, defendant admitted to Detectives Easton and Ferger that he intended to burglarize the Guzman house. This is not contradicted by Terry's testimony that he, Terry, did not intend to burglarize. Terry's testimony that he returned to the house because he was concerned about his cousin also indicates that his intention was different than defendant's. In this light, Terry's testimony cannot be considered even slight evidence that defendant did not intend a burglary. Nor does defendant's knocking on the door constitute such evidence. Considering defendant's admission that he attempted to enter through the obstructed front door, his knocking appears to be only an attempt to determine if anyone was home before he broke in. As for defendant's expressions of sorrow, they do not negate his intent at the time of the shooting.

We thus conclude that the tendered instructions were not required by the evidence introduced. A defendant cannot claim self-defense where the situation he encounters arises out of his own making. (*People v. Andersch* (1982), 107 Ill. App. 3d 810, 819.) Furthermore, a defendant should not be allowed to demand unlimited instructions which are wholly unrelated to the case but are based upon the merest factual reference or witness' comment. (*People v. Ishmael* (1984), 126 Ill. App. 3d 320, 326.) Since trial court's refusal of the tendered instructions was proper, defendant was not prejudiced by appellate counsel's failure to raise the issue, and thus he was not denied effective assistance of counsel on direct appeal.

The judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

LINDBERG, P.J., and INGLIS, J., concur.