THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JIMMIE BUFORD, Defendant-Appellant.

First District (1st Division)   No. 86—1830

Opinion filed December 30, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (Crystal H. Marchigiani and Kyle Wesendorf, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Carol L. Gaines, and Robert B. Berlin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a severed bench trial, defendant, Jimmie Buford, and

codefendants Xavier Young and Alfred Dismukes[1] were found guilty of murder and armed robbery. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), 18—2, respectively.) Defendant was sentenced to consecutive prison terms of 80 years for murder and 10 years for armed robbery. On appeal, defendant contends that: (1) his counsel failed to act as his advocate, thereby denying him his right to effective assistance of counsel; (2) his counsel's past friendship with the victim's son denied defendant his right to effective assistance of counsel; (3) the trial court improperly imposed consecutive sentences for murder and armed robbery; and (4) the extended-term sentence imposed by the trial court was excessive. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following. David Burns, occurrence witness for the State, testified that on Saturday, October 27, 1984, he worked the 9 a.m. to 7 p.m. shift at Winfield Groceries, located at the corner of Cullerton and Keeler in Chicago. Winfield Johnson, store owner, and William Wright were also working at the store that day. In describing the store layout, Burns stated that a deep freezer and checkout counter were located on the left side of the front door, an ice cream freezer and two pop coolers were on the right side and the meat counter was at the back of the store. Several aisles of stocked shelves were in the middle.

Burns further testified that at approximately 7 p.m. that night, Young entered the store and told Burns that he wanted to purchase some meat. At that time, Johnson was at the checkout counter. Burns directed Young to the meat counter in the rear of the store where Wright waited on him. Burns returned to stocking the coolers and the ice cream freezer in the front of the store. A few minutes later, defendant and Dismukes entered the store. Defendant walked to the middle aisle and Dismukes stook in line behind a customer at the checkout counter. When the customer left, defendant ran to the front door and locked it. Dismukes then pulled out his gun and announced a stick-up. Defendant, armed with a small black pistol, ran around the checkout counter to where Johnson was standing and ordered him to open the cash register. Johnson refused to do so.

Meanwhile, Dismukes told Burns to lie facedown on the floor. From this position, Burns could see defendant and Johnson at the checkout. Defendant then pushed Johnson to the middle aisle and down onto his stomach. Burns then heard Johnson say, "Oh, no," fol-

---

[1]In separate appeals, the convictions and sentences for both Young (No. 86—66) and Dismukes (No. 85—3455) were affirmed.

lowed by a shot. After the shot, Dismukes ordered Burns to open the cash register. As Burns walked toward the checkout counter, he saw Johnson lying on the floor and defendant going through his belongings.

Once Burns opened the cash register, Dismukes took the food stamps and cash. As defendant and Dismukes were getting ready to leave, defendant called out, "Hey, come on," and Young came running from the rear of the store. After defendant, Dismukes and Young left the store together, Burns watched them run east on Cullerton and then cross the street. Approximately five weeks later, Burns identified defendant in a lineup.

Detective James Antonacci of the Chicago police department testified that he arrested defendant on December 3, 1984, after Burns had tentatively identified him from a photo array. At the time of his arrest, defendant stated that he had no knowledge of the incident and denied his participation. However, after the lineup in which Burns identified him, defendant changed his position and gave the following statement: the robbery had been the idea of an employee at Winfield Groceries nicknamed "Kewanee," who had discussed the idea with defendant and Young, explaining that Johnson was an old man who usually carried about $300 in cash on him, plus had money in the cash register and under the register drawer. Kewanee advised defendant and Young that the best time to rob the store would be on a Saturday, approximately 7 p.m.

Defendant further stated that on Saturday, October 27, 1984, he left his house, armed with a .22 caliber gun and a .38 caliber gun, and went to a nearby park where he met Young and Curtis Williams. Dismukes joined them and asked to participate in the robbery. Defendant gave Dismukes the .22 caliber gun to use. Curtis Williams, Dismukes, Young and defendant then drove to Winfield Groceries in Williams' car. Dismukes, Young and defendant got out of the car and entered the store. Dismukes went to the back of the store, while defendant and Young remained in the front, pretending to shop. When the last customer left, defendant closed the door and ran over to Johnson, grabbed him with one hand, and took him to the middle aisle where he pushed him to the floor. When Johnson started to struggle, defendant shot him.

Defendant stated that Young and Dismukes were at the cash register while he was struggling with Johnson. The three then left, got into Williams' car and drove away. Defendant signed and initialled his post-arrest statement, and Detective Antonacci witnessed the signature.

The defense then rested its case without calling any witnesses. During closing arguments, defense counsel argued that defendant had not shot Johnson in cold blood as the State suggested. Rather, Johnson had been accidently shot while he and defendant were struggling for the gun. Defense counsel further stated that defendant never intended to hurt anyone. He had intended only to rob Johnson. Following the court's finding that defendant was guilty of murder and armed robbery, the State requested a statutory hearing regarding imposition of the death penalty.

When the proceedings resumed, defense counsel moved for leave to withdraw as counsel on the grounds that he recently learned that he had known the victim's son. Defense counsel explained that on the last status court date, when the court had read a letter in aggravation from James Winford Johnson, the victim's son, defense counsel realized that he had known the son many years ago. Because of the possible conflict, defense counsel immediately notified defendant and asked him if he would like different counsel for the sentencing and death penalty hearing. When defendant indication that he would, defense counsel notified the State.

After explaining the situation to the court, defense counsel stated that he did not think he should withdraw prior to a decision on his motions for new trial and arrest of judgment because when those were filed, he had no knowledge of having known the victim's son. Following a brief discussion, the court denied defendant's motions for new trial and arrest of judgment and granted defense counsel's leave to withdraw. The case was then continued for appointment of new counsel.

When the case resumed with new counsel, a jury was selected for the bifurcated death penalty hearing. At the first stage of the hearing, the jury found that defendant was eligible for the death penalty on the grounds that he was at least 18 years old at the time of the offense and the victim was killed in the course of an armed robbery. At the second stage of the hearing, after considering both aggravating and mitigating factors, the jury found that it could not unanimously conclude that the death penalty should be imposed. A hearing on the post-trial motions filed by the newly appointed defense counsel and on sentencing was then set.

At the hearing, the trial court denied defendant's motions for a new trial and arrest of judgment and proceeded with testimony regarding aggravation and mitigation. The court then sentenced defendant to consecutive terms of 80 years for murder and 10 years for armed robbery. Defendant's timely appeal followed.

On appeal, defendant first contends that defense counsel failed to act as his advocate, thereby depriving him of his right to effective assistance of counsel. Specifically, defendant argues that defense counsel: (1) conceded defendant's guilt during closing argument and raised a legally incorrect defense; (2) failed to question the eyewitness and the police officer who had taken defendant's incriminating statement; and (3) failed to develop an intoxication defense to the murder charges.

Regarding his first contention, defendant claims that in closing argument, defense counsel not only repudiated his pleas of not guilty, but also advanced the legally invalid theory that the killing was accidental when defense counsel stated:

"Your Honor, the State has produced evidence which suggests to this Court that there were two things that happened on this day in question. There was a purposeful robbery of the grocery store, and there was an accidental shooting of Mr. Johnson."

In response, the State argues that defense counsel was simply acknowledging that someone had committed a robbery, not conceding that it was defendant who had committed the robbery.

As support for his argument that defense counsel had conceded his guilt, defendant relies on *People v. Woods* (1986), 151 Ill. App. 3d 687, 502 N.E.2d 1103. In *Woods*, codefendants were charged with burglary and with theft of an automobile battery from a parked automobile. In his opening statement, defense counsel stated that the defendants had no knowledge of the theft of a battery. Later, in direct contradiction to defendants' theory of having no knowledge, defense counsel stated in his closing argument, "They stole a battery." On appeal, the *Woods* court found, "By contradicting his clients' testimony, defense counsel destroyed whatever credibility they had and effectively deprived them of a defense to the charges." (151 Ill. App. 3d at 693.) We find *Woods* factually distinguishable from the present case. Unlike *Woods*, defense counsel in the present case did not concede defendant's guilt, he merely restated the State's theory in his own words. The word "suggests" is particularly important. By use of this word, defense counsel did not concede that the State had proven either the robbery or the accidental shooting. Instead, defense counsel merely reiterated what the State was suggesting by its evidence. By restating the State's theory, defense counsel neither adopted the theory nor admitted to its validity.

Defendant further argues that defense counsel's assistance was ineffective because he stated during closing argument that defendant had not intended to shoot Johnson. Defendant claims that

this defense was legally incorrect because accident is not a defense to the charge of felony murder.

A similar issue was addressed by this court in *People v. Gary* (1977), 49 Ill. App. 3d 704, 364 N.E.2d 726. In *Gary*, defendant and codefendant, Turner, were indicted for armed robbery and for armed violence, predicated upon the aggravated assault of Harry Foreman. At trial, Foreman testified that defendant had approached him with a shotgun and had demanded his money. When defendant fired a shot into the ground at Foreman's feet, Foreman laid his money on the ground. Turner then picked up the money and he and defendant fled. Foreman stated that he had recognized defendant because he had shot craps with him on numerous occasions.

As in the present case, the defendant in *Gary* did not testify at trial. The only defense presented was the stipulated testimony of a police officer regarding a statement Foreman had made shortly after the robbery that defendant had fired at him three times and had threatened to kill him. During closing argument, defense counsel accused Foreman of lying about his participation in a crap game that day with defendant and pointed out discrepancies in his testimony. Defense counsel further stated:

> "Maybe [defendant] overreacted, committed reckless conduct is what he did, committing aggravated assault. Yeah he did that. But did he commit the armed robbery, did he commit armed violence? I don't think so. I don't think he did that. I don't think it would be a fair verdict, either one of those in this case. Yes, he committed an aggravated assault, yes he committed a reckless conduct—a young foolish man did a young foolish thing. He didn't intend to hurt that Harry Foreman." (49 Ill. App. 3d at 706.)

Defendant was convicted of armed robbery and armed violence.

On appeal in *Gary*, defendant claimed that he was deprived of a fair trial due to ineffective assistance of counsel because defense counsel had failed to present the defense that defendant was merely retaking gambling losses and, thus, not guilty of armed robbery. In reaching its decision that defendant had not been denied effective assistance of counsel, the *Gary* court characterized defense counsel's comments to the jury during closing argument as a plea "for clemency by the jury." (49 Ill. App. 3d at 708.) The court reasoned that when defense counsel recognized the difficulty and improbability of convincing the jury that defendant had not actually forced Foreman to give up the money at gunpoint, he decided the "more intelligent tactical approach was to ask the jury to find defendant guilty of a

lesser offense." 49 Ill. App. 3d at 708.

Similarly, in the present case, defendant had been charged with two counts of intentional murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)) in addition to the count of felony murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3)), which requires no proof of intent. Defendant is correct that accident is not a defense to felony murder. (*People v. Bone* (1982), 103 Ill. App. 3d 1066, 432 N.E.2d 329.) However, defendant overlooks the fact that accident is a defense to the other two murder counts. In light of the evidence, including defendant's confession, that defendant participated in an armed robbery and that Johnson was killed during the robbery, defense counsel may have realized that the best tactic was to defend the intentional murder charges with the argument that the shooting had been an accident. In our view, this decision was one of trial strategy or tactics, which cannot support a claim of ineffective assistance of counsel. See *People v. Mack* (1984), 105 Ill. 2d 103, 473 N.E.2d 880.

█ Next, defendant claims that he was denied effective assistance of counsel when defense counsel failed to cross-examine the eyewitness, Burns, regarding his observations during the robbery. As support for his position, defendant relies on *People v. Brinson* (1980), 80 Ill. App. 3d 388, 399 N.E.2d 1010, which we find factually distinguishable from the present case. In *Brinson,* defense counsel failed to move for suppression of a weak identification or for suppression of defendant's confession, which was allegedly coerced and legally involuntary. The *Brinson* court held, "The failure to make such motions under the circumstances prevailing here indicates a fatalistic acceptance of the defendant's guilt or a lack of faith in his credibility, either of which fatally impairs any effective representation and is tantamount to no representation at all." 80 Ill. App. 3d at 394.

Unlike *Brinson,* in the present case, defense counsel had filed a pretrial motion to suppress identification, which the trial court denied. Further, during trial, defense counsel cross-examined Burns as to his hesitancy in identifying defendant during the photo identification and as to the fact that Burns had been lying facedown in one of the grocery aisles at the time of the shooting. In addition, during closing argument, defense counsel reiterated the fact that there had been no actual eyewitnesses to the shooting because Burns had been lying facedown in one of the aisles and could not have seen the gun being fired. Accordingly, contrary to defendant's position, the record indicates that defense counsel vigorously argued against Burns' identification testimony before, during and at the conclusion of the trial, The fact that defendant may not approve of defense counsel's strategy

does not provide grounds for his claim of ineffective representation. See *People v. Gary* (1977), 49 Ill. App. 3d·704, 364 N.E.2d 726.

Defendant further claims that defense counsel erred in failing to develop defendant's defenses that his confession was the result of physical intimidation and that defendant had been intoxicated at the time of the offense. With respect to the confession, defense counsel had moved prior to trial for suppression of the confession on the grounds, *inter alia*, that the confession had been coerced. The motion was denied. The fact that defense counsel did not choose to raise the same argument during the bench trial is a matter of trial strategy and, as stated previously, does not provide grounds for a claim of ineffective assistance of counsel.

Regarding defendant's alleged intoxication at the time of the offense, defendant did not indicate that he had been "high" during the robbery until after he had been convicted and was testifying on behalf of one of his codefendants. There is no evidence, nor does defendant suggest in his brief, that defense counsel knew defendant had been "high" during the robbery.

Next, defendant contends that defense counsel's admission that he had known the victim's son deprived defendant of effective assistance of counsel. During a status court date, after both sides had rested their cases, but before sentencing, the court read to both counsel a letter from the victim's son. At that time, defense counsel realized that he had known the victim's son years ago. Defense counsel immediately told defendant of his past relationship with the victim's son and asked defendant if he would like defense counsel to withdraw. Defendant indicated that he would like new counsel. The trial court then granted defense counsel's motion to withdraw and another counsel was appointed to represent defendant.

The facts indicate that during the trial and at the time post-trial motions were filed, defense counsel did not know of his past relationships with the victim's son. Accordingly, there are no factual grounds in the record to support defendant's suggestion that he had been denied effective assistance of counsel because of that relationship.

Defendant next contends that pursuant to section 5—8—4(a) of the Unified Code of Corrections (the Code) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a)), the trial court improperly imposed consecutive sentences for murder and armed robbery because the acts underlying the convictions were undertaken for the same objective, in the same confined space, and occurred in no more than 15 minutes. In response, the State argues that defendant's act of shooting Johnson in the head was a substantial change in the nature of the original crimi-

nal objective of robbery. Therefore, the court properly imposed consecutive sentences.

Section 5—8—4(a) of the Code states, in pertinent part:

"The court shall impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***."

As the above provision indicates, consecutive sentencing is proper if a defendant has been convicted of a Class X felony and if he had inflicted severe bodily injury during commission of the felony, regardless of whether defendant's criminal objective remained unchanged throughout the incident. (*People v. Russell* (1986), 143 Ill. App. 3d 296, 492 N.E.2d 960.) In the present case, defendant was convicted of armed robbery, a Class X felony (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(b)), and he inflicted severe bodily injury by shooting Johnson in the head. Thus, whether defendant's criminal objective remained unchanged throughout the incident is irrelevant to the propriety of the court's imposition of consecutive sentences because defendant's conviction and conduct during the incident satisfy the statutory exception to the "substantial change" requirement.

Even if defendant's criminal objections were relevant, based upon *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819, we find that defendant's criminal objective to rob the grocery store changed to murder when he shot Johnson. In *Williams*, defendant and an accomplice gained entry into the victim's home by pretending they had car trouble. When the victim opened the front door of his home, the defendant and his friend pushed open the door all the way, saw that the victim had a gun in his hand, and shot him. When the intruders found the victim's wife upstairs in the bedroom, they ordered her to tell them where the money was located. They then tied and gagged her. After taking some cash and personal property, the intruders left. Following a jury trial, defendant was sentenced to concurrent prison terms of 10 to 20 years of burglary and 20 to 40 years for armed robbery, with an additional term of 75 to 100 years for murder, to be served consecutively to the terms for burglary and armed robbery. In affirming the imposition of a consecutive sentence, the supreme court found that "the purpose of the robbers shifted, at least partially, at the time they shot Mr. Calderone." 60 Ill. 2d at 15.

Similarly, in the present case, the record indicates that defendant had entered the grocery store with the intention to rob Johnson.

When Johnson would not open the cash register, defendant threw him down in the grocery aisle and shot him once in the head. As evidenced by the fact that Burns eventually opened the cash register, defendant did not have to shoot Johnson in order to effectuate the robbery. He could have simply tied him up. Thus, the shooting was not a necessary step toward completing the original purpose of robbery. Instead, it was a change in purpose. Accordingly, we conclude that the trial court did not abuse its discretion in sentencing defendant to consecutive terms. See *People v. Sievers* (1978), 56 Ill. App. 3d 880, 372 N.E.2d 705.

■ Finally, defendant contends that the extended-term, consecutive sentence imposed by the trial court was excessive on the grounds that: (1) he was intoxicated when he had entered the store; (2) the killing had been accidental; and (3) there was no unnecessary cruelty involved. Defendant offers no legal authority to support these grounds. Instead, he simply states that this case "is one warranting a penalty less than the extended term, consecutive sentence of 90 years." In response, the State argues that defendant's conduct of throwing Johnson to the floor and shooting him in the head was exceptionally brutal and heinous conduct which, pursuant to section 5—5—3.2(b)(2) of the Code, warrants imposition of an extended-term sentence. Section 5—5—3.2 provides:

> "[T]he following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:
> &#42;&#42;&#42;
>
> (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty &#42;&#42;&#42;."

It is well established that sentencing matters are matters of judicial discretion and, provided that the sentence imposed is within statutory limits, reviewing courts may not reduce sentences absent a finding that the trial court abused its discretion. (*People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 483 N.E.2d 944.) Further, in evaluating the brutality and heinousness of the offense, the court will consider all of the circumstances surrounding the incident. *People v. Grady* (1982), 107 Ill. App. 3d 970, 438 N.E.2d 608.

Courts have found an extended-term sentence warranted on the grounds of heinous and brutal behavior in the following fact situations: when a husband shot his wife twice as she was walking toward him in a restaurant, then shot her four more times after she fell on

the floor. (*People v. Eckles* (1980), 83 Ill. App. 3d 292, 404 N.E.2d 358); when defendant shot the victim in the chest and then kicked him in the face when he fell to the floor (*People v. Grady* (1982), 107 Ill. App. 3d 970, 438 N.E.2d 608); and when defendant shot a victim from the rear with a high-powered weapon while the victim was minding his own business in front of his home (*People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 483 N.E.2d 944). In affirming the extended-term sentence in *Gutierrez*, the court described the defendant's actions as "cruel, cold-blooded and devoid of mercy." 136 Ill. App. 3d at 791.

In the present case, the evidence indicates that defendant pushed Johnson to the floor and then shot him in the head at close range. He then proceeded to rummage through Johnson's clothing. Defendant claims that the gun fired accidentally, but testimony that Johnson cried out "Oh, no" right before the shot was fired belies defendant's claim. Instead, Johnson's outcry suggests that he was pleading for his life after he was pushed to the ground. As in *Gutierrez*, we find that defendant's actions were "cruel, cold-blooded and devoid of mercy." Therefore, we hold that the trial court properly imposed an extended-term sentence.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINLAN and MANNING, JJ., concur.