2023 IL App (1st) 201176

FIRST DISTRICT
THIRD DIVISION
April 26, 2023

No. 1-20-1176

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 84 CR 14278 |
| | ) | |
| JIMMIE BUFORD, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

## OPINION

¶ 1      Defendant Jimmie Buford appeals the trial court's first stage dismissal of his postconviction petition. He argues on appeal that his 80-year sentence for first degree murder is an unconstitutional *de facto* life sentence under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was 22 years old at the time of the offense and has intellectual disabilities.

¶ 2      Following a bench trial, defendant was found guilty of first degree murder, armed robbery, and unlawful restraint arising from the shooting death of Winfield Johnson during the October 1984 robbery of Winfield Groceries in Chicago. The trial court subsequently sentenced defendant to a term of 80 years for the first degree murder conviction and 10 years for the armed robbery conviction, to be served consecutively, for a total sentence of 90 years.

¶ 3    While defendant's argument focuses on his 80-year sentence for first degree murder, his aggregate sentence is 90 years, which is subject to day-for-day good conduct credit. Thus, defendant's sentence requires him to serve at least 45 years in prison, which constitutes a *de facto* life sentence. See *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42 (holding that a sentence over 40 years is considered a *de facto* life sentence for juvenile defendants); *People v. Dorsey*, 2021 IL 123010, ¶ 64 (finding that when the applicable statutory good-conduct scheme provides a juvenile defendant some meaningful opportunity to obtain release after serving 40 years or less incarceration, the defendant's sentence is not a *de facto* life sentence); *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 131 (applying *Buffer* and *Dorsey* to youthful offenders).

¶ 4    Since defendant is not challenging his conviction, we detail the trial evidence only as necessary for the resolution of the issue raised on appeal. A full discussion of the evidence presented at defendant's trial can be found in his direct appeal. See *People v. Buford*, 178 Ill. App. 3d 329 (1988).

¶ 5    On October 27, 1984, defendant and his two codefendants, Xavier Young and Alfred Dismukes, entered Winfield Groceries, at the corner of West Cullerton Street and South Keeler Avenue in Chicago. When the last customer left the store, defendant locked the door, and Dismukes announced the robbery. Three employees were present in the store: David Burns, William Wright, and Johnson. Both defendant and Dismukes were armed. Defendant ordered Johnson to open the cash register, but when Johnson refused, defendant pushed him to the middle aisle. Burns testified at trial that he then heard Johnson say, "Oh no," and then a single gunshot. After the shot, Dismukes ordered Burns to open the cash register. As he walked to the cash register, Burns saw Johnson on the floor and defendant was going through Johnson's

belongings. When Burns opened the cash register, Dismukes took the cash and food stamps. The men then fled the store.

¶ 6    Defendant was arrested in December 1984 and was subsequently identified by Burns in a lineup. Following the identification, defendant gave a statement to a detective. In his statement, defendant said that the store robbery had been the idea of an employee named "Kewanee." Defendant admitted his participation in the robbery, including that he supplied the firearms for himself and Dismukes. Defendant admitted that when Johnson started to struggle, he shot him.

¶ 7    The defense did not present any evidence. At the conclusion of the trial, the trial court found defendant guilty of first degree murder, armed robbery, and unlawful restraint.

¶ 8    In November 1985, Dr. R.A. Reifman examined defendant and found him mentally fit for sentencing. According to Dr. Reifman, defendant understood the nature of the charge and the purpose of the proceedings and was able to assist counsel in aggravation and mitigation proceedings. However, Dr. Reifman was unable to complete a full psychological evaluation because defendant was "malingering a mental condition for obvious purposes."

¶ 9    The proceedings continued to a death penalty hearing before a jury in May 1986. At the first stage, the jury found defendant was eligible for the death penalty because he was over 18 years old and had committed a murder during an armed robbery. During the second stage, the parties introduced evidence in aggravation and mitigation. The State presented testimony from Wendell Lewis, Officer James Pubins, and Detective Patrick Harrington regarding the murder of Gary Pinkerton, in which defendant was alleged to have participated but was never charged.

¶ 10    Lewis testified that on July 10, 1984, he went to the apartment of Jackie Vance, located on the 2600 block of South Colon Street in Chicago. Cecil Tyson and a man known to Lewis as "Tony" were also present. Tyson asked for Lewis's help in moving a carpet from the apartment

to a truck. Lewis asked Tyson why the carpet was heavy, and Tyson told him, "it was good for [him] not to know." While moving the carpet through the apartment, defendant entered from the back porch, and they continued to drag the carpet to the porch. After they put the carpet in the back of the truck, Tyson asked Lewis to follow them with defendant in Lewis's car. He followed the truck to a gas station, and then continued to follow the truck into an alley near West Congress Parkway and South Pulaski Road. Defendant told Lewis to pull the car closer to the truck, and Tyson then got into the car. Tyson directed Lewis to pull the car up to a store. Tony ran up to the car and told them his matches did not work. Defendant said he had matches and left the car heading in the direction of where the truck was parked. Defendant and Tony ran back to the car a short time later and told Lewis to drive away. As he drove, Lewis looked in the direction of the truck and saw that it was on fire. Lewis was not charged with a crime related to this action, but Vance was later convicted of murder.

¶ 11    Officer Pubins testified that he was on duty the night July 10, 1984, when he received a radio call of a fire at 4030 West Congress Parkway. He responded to the call and observed numerous firefighters at the location. He saw a charred pickup truck in the alley. The rear of the truck contained a charred blanket and rug, with a charred body inside the rug. He later learned that the deceased person was named Gary Pinkerton. Officer Pubins smelled gasoline at the scene.

¶ 12    Detective Harrington was assigned to investigate Pinkerton's homicide in July 1984. During his investigation, he interviewed defendant. In the interview, defendant admitted to being present in Vance's apartment on July 10, 1984, with Vance, Tyson, and Pinkerton. While he was in the living room, Vance and Tyson discussed robbing Pinkerton, who was in another room. Vance then left the room and went to where Pinkerton was, and defendant then heard three gun

4

shots. Defendant and Tyson went to the bedroom with Vance. He saw that Pinkerton had been shot. Tyson then shot Pinkerton with a sawed-off shotgun, and Vance shot Pinkerton twice in the head. Tyson and Vance then went through Pinkerton's pockets, taking money and other property. Vance told defendant and Tyson to wrap Pinkerton's body in bed clothes, which they did, and then they rolled the body in a rug. Several hours later, after Lewis and Tony arrived, defendant assisted in carrying the body to truck and driving it to the location on West Congress Parkway. Tony poured gasoline on the body in the truck, and defendant lit it with matches. Detective Harrington contacted the State's Attorney's office, but no charges were brought against defendant relating to the murder of Pinkerton.

¶ 13    The State also presented defendant's prior conviction in a certified statement of conviction. The statement indicated that defendant pled guilty in April 1983 to theft and burglary and received a sentence of 18 months' probation.

¶ 14    In mitigation, the defense presented the testimony of defendant's mother, Barbara Buford; his sister, Latoria Buford; his uncle, Hugh Williams; and a neighbor, Ruby Scafe. The witnesses each testified about their relationship with defendant and his character. They asked the jury not to impose the death penalty on defendant.

¶ 15    Defendant also testified in mitigation. He did not finish high school and dropped out in the eleventh grade. On the day of the grocery store robbery, he met with Dismukes, Young, and Curtis Williams. Defendant admitted to talking to the individual "Kawanni," who worked at Winfield Grocery. Kawanni told defendant that he needed money and wanted the men to rob the grocery store. They went to the store in Williams's car. Defendant provided two guns for the robbery. Defendant knew that he could not carry an unregistered gun and was not allowed to possess them because he had previously been convicted of a felony burglary.

¶ 16     According to defendant, he brought a gun into the store to scare Johnson, but he had no intention of hurting anyone in the store. He knew the gun was loaded. Young went to the back of the store to be a "lookout." Dismukes went to the counter. They waited until the last customer left, and then defendant pulled out his loaded gun. Johnson was around 65 years old.

¶ 17     Defendant admitted that he took Johnson into the aisle, but he did not intend to shoot him. In the aisle, defendant told Johnson to lay on the floor, but Johnson rushed him. He grabbed Johnson and told him to lay down, which Johnson then did. Defendant told Johnson to give him the money. Defendant bent down to take the money with his left hand and Johnson grabbed the gun. Defendant pulled the gun away and it fired. Defendant testified that it was an accident, and he did not shoot Johnson intentionally, but he admitted that he had his finger on the trigger and knew the gun was loaded. Defendant made this statement to the jury, "I know what I've done is wrong and that I ain't never really did nobody [*sic*] any type of bodily harm, and I've been convicted and I know I have to pay for it, but I don't want to pay for it with my life."

¶ 18     Defendant also testified about Pinkerton's murder. He admitted to being present in Vance's apartment with her and Tyson, but denied knowing that they were going to murder Pinkerton. When he heard Vance shoot Pinkerton, defendant was scared. He did not know that Tyson had a shotgun. Vance had drugs in her apartment, and defendant had smoked marijuana with PCP. He did not leave the apartment because he was afraid Vance and Tyson would shoot him. When asked if he should have learned his lesson in that case, defendant responded that he should have, but he was getting high so much that it did not bother him.

¶ 19     Defendant admitted that he confessed to the police about his involvement in the grocery store robbery, but later he recanted and lied in his testimony at Young's trial. He stated that he

tried to cover up for his codefendants because the shooting was an accident. He did not want them to go to jail because he did this and wanted to pay for it by himself.

¶ 20    Following the second stage proceedings, the jury was unable to unanimously find that there was no mitigating factor or factors sufficient to preclude the imposition of the death penalty.

¶ 21    The case then proceeding to a sentencing hearing before the trial court. At the June 1986 hearing, the parties relied on the aggravation and mitigation evidence presented at the death penalty hearing. The State asked the court to sentence defendant to a term of natural life, while defendant requested a prison term less than natural life. The trial court stated that it had considered the bench trial proceedings, the jury death penalty hearing, the sentencing hearing, as well as defendant's presentence investigation. After considering the aggravating and mitigating factors, the court sentenced defendant to a term of 80 years for first degree murder and a consecutive term of 10 years for armed robbery, to be served consecutively, for a total sentence of 90 years.

¶ 22    On direct appeal, defendant argued that

> "(1) his counsel failed to act as his advocate, thereby denying him his right to effective assistance of counsel; (2) his counsel's past friendship with the victim's son denied defendant his right to effective assistance of counsel; (3) the trial court improperly imposed consecutive sentences for murder and armed robbery; and (4) the extended-term sentence imposed by the trial court was excessive." *Buford*, 178 Ill. App. 3d at 331.

The reviewing court declined to find trial counsel was ineffective, found the trial court did not err in imposing defendant's sentence, and affirmed defendant's conviction and sentence. *Id.* at 340.

¶ 23    In reviewing defendant's claim that his extended term sentence was excessive, the *Buford* court found that

> "the evidence indicates that defendant pushed Johnson to the floor and then shot him in the head at close range. He then proceeded to rummage through Johnson's clothing. Defendant claims that the gun fired accidentally, but testimony that Johnson cried out 'Oh, no' right before the shot was fired belies defendant's claim. Instead, Johnson's outcry suggests that he was pleading for his life after he was pushed to the ground." *Id.*

The court then concluded that defendant's actions were cruel, cold-blooded, and devoid of mercy and that the trial court properly imposed an extended term sentence. *Id.*

¶ 24    In June 2001, defendant filed a *pro se* petition seeking *habeas corpus* relief. In his petition, defendant argued that his sentence was void under the United States Supreme Court decision of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The trial court dismissed defendant's petition without prejudice, and he appealed. On appeal, appellate counsel sought leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). This court granted counsel's motion to withdraw and dismissed defendant's appeal for lack of jurisdiction because the trial court's dismissal order was not final and appealable. *People v. Buford*, No. 1-03-1020 (June 21, 2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 25    In August 2020, defendant filed his *pro se* postconviction petition. We note that defendant styled his petition as a successive petition and requested leave to file the petition, but

the record does not indicate that he previously filed a postconviction petition and the parties do not dispute that this was defendant's first petition.

¶ 26    In his petition, defendant argued that his 80-year sentence for murder was unconstitutional under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because his intellectual disabilities should be treated similarly to a juvenile defendant. Defendant contended that his IQ was between 52 and 62 and he left school at the eighth-grade level. He asserted that he has not been able to obtain his GED while incarcerated due to "his lack of intellect and short attention" span. In his attached affidavit, defendant stated that he was addicted to PCP and wine from the age of 17 until his incarceration. He also stated that he was beaten by his mother when he failed to understand her directions. In September 2020, the trial court held that defendant's petition was without merit and dismissed it on the record.

¶ 27    This appeal follows.

¶ 28    On appeal, defendant contends that he has set forth an arguable claim that his 90-year sentence is unconstitutional because the trial court failed to consider his intellectual disability, his traumatic upbringing, and his youthful age of 22. Specifically, defendant argues that, based on the recent case law concerning the sentencing of juvenile and youthful offenders following *Miller v. Alabama*, 567 U.S. 460 (2012), his sentence violates the proportionate penalties clause.

¶ 29    The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 to 122-7 (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *Id.* § 122-1(a); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction

9

Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

¶ 30     At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional." *Id.* at 16-17.

¶ 31     If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2018). At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Post-Conviction Act. *Coleman*, 183 Ill. 2d at 380. The circuit court is not permitted to engage in any fact-finding or credibility determinations. *Id.* at 385. At this stage of the proceedings, we are to accept well-pleaded factual allegations of a postconviction petition and its supporting evidence as true unless they are positively rebutted by

the record of the original trial proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 48. We disregard any legal conclusions unsupported by allegations of fact. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 48.

¶ 32    Initially, we address the State's assertion that defendant's argument on appeal, focusing on *Miller* protections for a young adult offender, differs from the claim raised in his *pro se* petition and has been forfeited. In his reply, defendant argues that a liberal reading of his petition demonstrates that this is the same claim he raised in his postconviction petition because his petition alleged that his personal characteristics, including his intellectual disability, made him akin to a juvenile at the time of the offense.

¶ 33    Generally, Illinois courts have held that a claim not raised in the postconviction petition cannot be raised for the first time on appeal. *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006); *People v. Jones*, 213 Ill. 2d 498, 505 (2004); see 725 ILCS 5/122-3 (West 2018) ("[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived").

¶ 34    In his *pro se* petition, defendant did not specifically challenge his sentence under *Miller* due to his age at the time of the offense. Rather, defendant argued that—based on his intellectual disabilities, as well as his upbringing and drug use—he should be treated the same as a juvenile with less culpability, relying primarily on *Atkins v. Virginia*, 536 U.S. 304, 318 (2002). In *Atkins*, the Supreme Court considered whether an intellectually disabled defendant could be found to have a reduced culpability sufficient to preclude the death penalty. *Id.* at 320. In his supporting memorandum, defendant asserted that, under *Atkins*, he was subject to a reduced culpability based on his characteristics and history, including that (1) his IQ was between 52 and 62, (2) he

had a problem comprehending matters, (3) he suffered physical abuse by his mother, and (4) he abused drugs and alcohol since he was 17.

¶ 35    Defendant's argument on appeal asks this court to consider these same characteristics, but in the context of his age as a youthful offender. In this context, defendant relies on *Miller*, which held that, prior to imposing a life sentence on a juvenile offender, a sentencing judge must have the opportunity to consider mitigating factors, such as the juvenile's age, the juvenile's family and home environment, the effects of familial or peer pressure, and the possibility of rehabilitation. *Miller*, 567 U.S. at 477-78. In his petition, defendant cited *Miller* in relation to his argument on *Atkins* to observe the Supreme Court's consideration of sentencing culpability. When we liberally construe the claim raised in defendant's petition, we find that defendant sought in both his petition and his appeal to challenge the constitutionality of his sentence, based on his characteristics, including IQ, prior abuse, and drug and alcohol abuse. Thus, his claim has not been forfeited on appeal. However, for the reasons that follow, defendant has not established an arguable claim that his *de facto* life sentence was unconstitutional under either argument.

¶ 36    The sentencing of juvenile and youthful offenders has been evolving in the country over the last several years. Beginning with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court weighed in and set forth new constitutional parameters for the sentencing of juvenile offenders. See also *Graham v. Florida*, 560 U.S. 48, 68 (2010); *Miller*, 567 U.S. at 479-80; *Montgomery v. Louisiana*, 577 U.S. 190, 210-213 (2016). "[T]he United States Supreme Court has advised that 'children are constitutionally different from adults for purposes of sentencing.' " *People v. Lusby*, 2020 IL 124046, ¶ 32 (quoting *Miller*, 567 U.S. at 471). "The Court outlawed capital sentences for juveniles who commit murder in *Roper* and capital sentences for juveniles who commit nonhomicide offenses in *Graham*. And in *Miller*, the Court

barred mandatory life sentences for juveniles who commit murder." *Id. Miller* has since been held to apply retroactively. *Montgomery*, 577 U.S. at 210-212; see *People v. Holman*, 2017 IL 120655, ¶ 38 (recognizing that *Miller* applied retroactively).

¶ 37    Since *Miller*, the Illinois Supreme Court has suggested similar sentencing challenges are viable for youthful offenders, *i.e.*, defendants who are young, but legal adults. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (finding that a 19-year-old defendant was not necessarily foreclosed from raising an as-applied challenge in the trial court and observing that the Post-Conviction Act was designed to resolve such constitutional claims); *People v. Harris*, 2018 IL 121932, ¶ 48 (concluding that the 18-year-old defendant's as-applied proportionate penalties challenge was "more appropriately raised" in a postconviction proceeding rather than on direct appeal).

¶ 38    Unlike the mandatory life sentence imposed in *Miller*, here defendant's *de facto* life sentence was discretionary. Recently, the Illinois Supreme Court in *People v. Clark*, 2023 IL 127273, ¶ 72, held that the reasoning in *Miller* does not apply to discretionary sentences. In that case, the defendant sought leave to file a successive postconviction petition challenging his 90-year sentence under the proportionate penalties clause because the sentencing court failed to give sufficient weight to his mitigating characteristics, including his intellectual disabilities and his age. *Id.* ¶ 2. The trial court denied the defendant leave to file his successive petition, and the Third District affirmed the denial of leave. *Id.* ¶ 29 (citing *People v. Clark*, 2021 IL App (3d) 180610, ¶ 17).

¶ 39    On appeal, the defendant argued that his sentence violated the proportionate penalties clause under *Miller* and its progeny. The *Clark* court held that the defendant's sentence claim "fail[ed] as a matter of law." *Id.* ¶ 70. The supreme court found that the defendant's case was

"unlike *Miller*, where the constitutional error occurred because the sentencing court was prohibited from considering the mitigating facts at issue in that case, *i.e.*, mitigation stemming from the juvenile defendant's youth." *Id.* ¶ 71. As our supreme court observed, "[t]he *Miller* Court was concerned with mandatory life sentences where the sentencing court had no discretion to consider the juvenile offender's youth before imposing the harshest prison sentence available." *Id.* (citing *Miller*, 567 U.S. at 479). The *Clark* court further noted that the United States Supreme Court later "clarified that the holding in *Miller* does not apply to discretionary life sentences where the sentencing court does have discretion to consider youth and attendant characteristics at sentencing." *Id.* (citing *Jones v. Mississippi*, 593 U.S. ____, ____, 141 S. Ct. 1307, 1314 (2021)).

¶ 40    In reviewing the defendant's sentence, the supreme court pointed out that the defendant's *de facto* life sentence was discretionary, not mandatory. *Id.* ¶ 72. The court observed that, at the time of the defendant's sentencing, the sentence for first degree murder ranged from no less than 20 years to no more than 60 years. *Id.* (citing 730 ILCS 5/5-8-1(a)(1)(a) (West 1992)). Because the victim was 60 years of age or older when the defendant murdered her, the trial court had the discretion to impose an extended term sentence of not less than 60 years and not more than 100 years. *Id.* (citing 730 ILCS 5/5-8-2(a)(1) (West 1992)). "By sentencing [the] defendant to 90 years for first degree murder, the circuit court issued a discretionary *de facto* life sentence, making the reasoning of the *Miller* decision not applicable to [the] defendant's sentence." *Id.* The *Clark* court held that the "reasoning in *Miller* does not apply to discretionary life sentences under proportionate penalties clause standards where the circuit court does consider all relevant mitigating factors at sentencing and the circuit court's exercise of discretion is supported by the evidence in the record." *Id.*

¶ 41 The supreme court found that the trial court, in exercising its discretion, considered the relevant mitigating evidence. *Id.* ¶ 73.

> "Therefore, the concern the *Miller* Court addressed, *i.e.*, lack of discretion to consider the characteristics of youth in mitigation, is not present in this case where the circuit court issued a discretionary sentence after considering the characteristics of defendant's intellectual disabilities. The circuit court's exercise of discretion at sentencing, after considering the characteristics of defendant's intellectual disabilities, did not violate the proportionate penalties clause." (Emphasis omitted.) *Id.*

¶ 42 While defendant's petition in this case was not a successive petition, the holding in *Clark* applies here. Unlike in *Miller*, defendant in this case had extensive sentencing proceedings in which aggravating and mitigating evidence was presented and considered, first by the jury and later by the trial court. A jury considered this evidence during the second stage of death penalty proceedings, in which several witnesses testified in both aggravation and mitigation, including defendant on his own behalf. After the jury failed to reach a unanimous verdict on the death penalty sentence, the trial court conducted a sentencing hearing and was asked to consider the same evidence in aggravation and mitigation. The court heard the sentencing recommendations and arguments from both parties, with the State seeking a natural life sentence and the defense asking for a term less than natural life. The court weighed all the factors and imposed a discretionary sentence of less than natural life, a term of 90 years. We again note that defendant will only serve a period of 45 years with day-for-day credit.

¶ 43 As in *Clark*, at the time of the sentencing hearing, the sentencing range for first degree murder was not less than 20 years and not more than 60 years. Ill. Rev. Stat 1987, ch. 38, ¶ 1005-

8-1(a)(1)(a). A discretionary extended term sentence could be imposed "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat 1987, ch. 38, ¶ 1005-5-3.2(b)(2). Under section 1005-8-2(a)(1) of the Unified Code of Corrections, the trial court had discretion to impose an extended term sentence of not less than 60 years and not more than 100 years. Ill. Rev. Stat 1987, ch. 38, ¶ 1005-8-2(a)(1).

¶ 44   Here, the trial court explicitly stated that it had considered the "statutory aggravating and mitigating factors." The court then sentenced defendant to an extended term of 80 years for Johnson's first degree murder. As discussed above, defendant challenged the trial court's imposition of an extended term sentence on direct appeal, which the reviewing court rejected and found defendant's actions were cruel, cold-blooded, and devoid of mercy. *Buford*, 178 Ill. App. at 340. Like the defendant in *Clark*, the trial court imposed a discretionary *de facto* life sentence on defendant, "making the reasoning of the *Miller* decision not applicable to defendant's sentence." *Clark*, 2023 IL 127273, ¶ 72. Accordingly, defendant's sentencing challenge fails as a matter of law.

¶ 45   Assuming *arguendo* that *Miller* applies to discretionary sentences, we first consider defendant's argument seeking sentencing protections because he was 22 at the time of the offenses. Here, defendant contends that under *Miller* and its progeny, his *de facto* life sentence violates the proportionate penalties clause because his brain was more akin to that of a juvenile when he committed the offenses at age 22. While defendant cites several cases to support his *Miller* claim, nearly all involved proportionate penalties claims advanced by defendants who were 18 or 19 years old at the time they committed the offenses, rather than 22 years old. See *People v. Minniefield*, 2020 IL App (1st) 170541; *People v. Franklin*, 2020 IL App (1st) 171628;

*People v. Johnson*, 2020 IL App (1st) 171362; *People v. Bland*, 2020 IL App (3d) 170705;

*People v. Ruiz*, 2020 IL App (1st) 163145; *People v. Daniels*, 2020 IL App (1st) 171738; *People*

*v. Carrasquillo*, 2020 IL App (1st) 180534.

¶ 46    Defendant relies extensively on *People v. Savage*, 2020 IL App (1st) 173135, for support

and asserts that *Savage* is analogous to the present case. In *Savage*, the defendant was 22 years

old at the time he committed first degree murder and was subsequently sentenced to 85 years. *Id.*

¶ 2. In his postconviction petition, the defendant argued that his drug addiction from the age of

nine made him the functional equivalent of a "younger man." *Id.* ¶ 67. The defendant further

alleged that he was using drugs every day at the time of the offense and that he was attempting to

rob a drug house at the time of the murder. *Id.* ¶ 71. The *Savage* court found the defendant's

allegations were supported by detailed hospital records and the presentence investigation report.

*Id.* ¶ 72. The reviewing court also observed that the record failed to disclose whether the

sentencing court considered the "attributes of young adulthood *** in light of defendant's

lifelong drug addiction." *Id.* ¶ 74. The *Savage* court concluded that the defendant's allegations,

taken as true, could not be considered frivolous or patently without merit and advanced his

petition to the second stage. *Id.* ¶¶ 76, 80. Defendant argues that the same conclusion is

warranted in this case because he was also 22 at the time of the offense and struggled with drug

and alcohol abuse.

¶ 47    Since its issuance, the *Savage* decision has become an outlier in the developing case law

regarding youthful offenders and "appears to be the only reported decision of this court

extending *Miller*-based sentencing protections [citation] to a defendant over 21 years of age."

*People v. Guerrero*, 2022 IL App (1st) 210400, ¶ 29. "Numerous cases decided after *Savage*

have either distinguished it or rejected its reasoning entirely." *Id.* (citing *People v. Montanez*,

2022 IL App (1st) 191930, ¶¶ 57-62, *People v. Gholston*, 2021 IL App (1st) 200188-U, ¶ 34, *People v. Kruger*, 2021 IL App (4th) 190687, ¶¶ 30-31, and *People v. Williams*, 2021 IL App (1st) 190535, ¶¶ 28-32).

¶ 48    Significantly, this court has previously considered and rejected the same argument advanced by defendant. *People v. Green*, 2022 IL App (1st) 200749; *People v. Hemphill*, 2022 IL App (1st) 201112. We held that *Miller* and its progeny do not support a sentencing challenge for a defendant aged 21 years and over. *Green*, 2022 IL App (1st) 200749, ¶ 42; *Hemphill*, 2022 IL App (1st) 201112, ¶ 32. In those cases, the defendants, who were 21 years old, both argued that they had a viable claim that their sentences violated the proportionate penalties clause because the trial court imposed the sentences without any consideration of their age and its attendant characteristics. *Green*, 2022 IL App (1st) 200749, ¶ 30; *Hemphill*, 2022 IL App (1st) 201112, ¶ 25. In reaching our conclusion, this court in *Green* observed that the recent statutes enacted by the General Assembly regarding youthful offenders limited relief to defendants under 21 years of age. *Green*, 2022 IL App (1st) 200749, ¶ 41 (citing 730 ILCS 5/5-4.5-115 (West 2020), and 705 ILCS 405/1-3(2), (10) (West 2018)).

¶ 49    In *Green*, we held that "the line of adulthood has been drawn at age 21." *Id.* ¶ 42; *Hemphill*, 2022 IL App (1st) 201112, ¶ 40 (finding that the 21-year-old defendant "was an adult for purposes of a *Miller* claim"); see *People v. Humphrey*, 2020 IL App (1st) 172837; *People v. Rivera*, 2020 IL App (1st) 171430; *People v. Suggs*, 2020 IL App (2d) 170632. We continue to adhere to this reasoning in the present case and hold that *Miller* is inapplicable because defendant was an adult at 22 years old, nearly 23, at the time of the offenses. Therefore, defendant's sentencing challenge based on his age lacks a factual and legal basis.

¶ 50    Similarly, to the extent that defendant argues his sentence is unconstitutional based on his

intellectual disability, the Illinois Supreme Court has foreclosed a proportionate penalties challenge on this basis. *People v. Coty*, 2020 IL 123972.

¶ 51    In *Coty*, the supreme court concluded that, "although *Miller* is based in part on the lesser culpabilities of youth, characteristics those with intellectual disabilities tend to share, 'the *Miller* Court's decision is founded, principally, upon the *transient* characteristics of youth, characteristics not shared by adults who are intellectually disabled.' " (Emphasis in original.) *Green*, 2022 IL App (1st) 200749, ¶ 52 (quoting *Coty*, 2020 IL 123972, ¶ 39).

¶ 52    The *Coty* court emphasized the "very different issue" between subjecting an intellectually disabled defendant to execution and permitting the imposition of a mandatory natural life sentence. *Coty*, 2020 IL 123972, ¶ 33. Given the static nature of an intellectual disability, the court found a reduced probability of rehabilitation. *Id.* ¶¶ 37-40. As the court noted, "unlike a juvenile, whose mental development and maturation will eventually increase that potential, the same cannot generally be said of the intellectually disabled over time." *Id.* ¶ 37. "The rehabilitative prospects of youth do not figure into the sentencing calculus" for an intellectually disabled adult defendant. *Id.* ¶ 40. The *Coty* court concluded that the intellectually disabled defendant's initial mandatory natural life sentence was not unconstitutional as applied to him. *Id.* ¶ 42. As the *Coty* court observed, "[c]ourts across the country that have addressed the issue *** have declined to extend *Atkins* to noncapital sentences or *Miller* to the intellectually disabled." (Internal quotation marks omitted.) *Id.* ¶ 45.

¶ 53    Defendant contends that the instant case is distinguishable from *Coty* and its holding. He contends that, unlike the 46-year-old defendant in *Coty*, he was only 22 years old at the time of the offense. Further, unlike the extensive criminal record of the defendant in *Coty*, he had only one prior conviction for possession of marijuana. He also notes that there was no evidence in

*Coty* that the defendant had suffered from drug and alcohol addiction, which defendant explicitly discussed in his petition.

¶ 54    However, this court in *Green* declined to depart from *Coty* based on age and offense. We held that the "supreme court's analysis in *Coty* did not limit its holding to the facts before it, but rather, observed that mental disabilities are a 'predominately static condition.' " *Green*, 2022 IL App (1st) 200749, ¶ 62 (quoting *Coty*, 2020 IL 123972, ¶ 42). Following *Coty*, we rejected any claim by defendant that *Miller* protections should be extended to his case due to his intellectual disabilities. *Id.* We reach the same conclusion here. We do not find that defendant's drug and alcohol abuse negates the supreme court's finding in *Coty* because his main argument in his petition was that his intellectual disability rendered him akin to juvenile for sentencing purposes.

¶ 55    Additionally, the supreme court in *Clark* considered an argument similar to the one advanced here. *Clark*, 2023 IL 127273, ¶ 74. The *Clark* court adhered to its previous holding in *Coty* and found that the concerns regarding the transient characteristics of youth analyzed in *Miller* did not apply to the defendant's characteristics of intellectual disability. *Id.* ¶ 82. For the same reasons as in *Green*, defendant's claim fails. Accordingly, defendant's argument lacks an arguable basis in law or in fact, and the trial court properly dismissed his petition at the first stage.

¶ 56    Based on the following reasons, we affirm the decision of the circuit court of Cook County.

¶ 57    Affirmed.

---

## *People v. Buford*, 2023 IL App (1st) 201176

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 84-CR-14278; the Hon. James B. Linn, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Joseph Michael Benak, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Paul E. Wojcicki, and Amy McGowan, Assistant State's Attorneys, of counsel), for the People. |